**C.I.T. CORPORATION, Appellant,**

v.

**A & A PRINTING, INC., a/k/a Andrew Business Forms, Appellee.**

**Civil No. C–86–617–G.**

United States District Court,
M.D. North Carolina,
Greensboro Division.

March 5, 1987.

David S. Walls, Charlotte, N.C., for appellant.

Charles M. Ivey, III, Greensboro, N.C., for appellee.

## MEMORANDUM OPINION

BULLOCK, District Judge.

In this appeal from a final order of the Bankruptcy Court, the issue presented is whether a trustee-in-bankruptcy may recover from property securing an allowed secured claim the rental expense of housing the property from the time of the petition to the time of the property's abandonment, and the expense of security in protecting the property. The Bankruptcy Court ruled that the trustee could recover those expenses under 11 U.S.C. § 506(c), which permits assessing against the secured claimant the estate's reasonable and necessary expenses in preserving or selling the secured property, and charged the secured

claimant $2,000.00. Because the court finds that the rental and security expenses at issue were administrative expenses of the estate, and were not incurred for the benefit of the secured claimant, the court holds that they may not be charged against the secured creditor. The Bankruptcy Court thus erroneously applied Section 506(c) and must be reversed.

## FACTS

The debtor in this case, A & A Printing, Inc. (hereinafter "A & A"), of Greensboro, North Carolina, purchased a large printing press in November 1983 from Didde Graphic Systems Corp. for $354,000.00. As part of the transaction, Didde took a purchase-money security interest in the press. Didde later transferred all of its rights in the A & A sale, including the security interest, to C.I.T. Corporation (hereinafter "C.I.T.").

Unfortunately, A & A soon met financial hard times, and moved for protection under Chapter 11 of the Bankruptcy Code less than two years after it purchased the press. At that time, the value of the press had decreased considerably, to approximately $150,000.00, while A & A's debt on the sales contract had been reduced only to $226,000.00. C.I.T., as an under-secured creditor, sought relief from the automatic stay or, alternatively, adequate protection of its interest. In November 1985, the Bankruptcy Court granted C.I.T.'s motion for adequate protection, and ordered A & A to pay the contract rate of interest on the current value of the press ($150,000.00) in monthly installments.

A & A did not make those payments, and C.I.T. again moved for relief from the stay in January 1986. The Bankruptcy Court again ordered A & A to make monthly payments, and provided that if it did not by March 15, 1986, the stay would automatically be lifted. A & A did not meet the March 15 deadline, but instead moved for conversion of the proceedings to liquidation under Chapter 7 on March 19. Charles Ivey, III, was appointed trustee of the estate.

C.I.T. at this point urged the trustee to abandon the press into C.I.T.'s possession, as the estate clearly had no equity in the press and C.I.T. believed it had buyers for it. The trustee refused abandonment until he had the whole of the estate's assets appraised. The trustee later stated in court that he also wished to keep the assets of the printing company together, in the hope that the attractiveness of the press would bring more buyers to an auction sale. Record 97 at 12. C.I.T. consequently moved for abandonment of the press into its hands on April 21, 1986. The trustee then consented to abandonment, but sought to recover expenses incurred in preserving C.I.T.'s collateral. The trustee specifically asserted that the rental expense of A & A's business location (whence the press had not moved), from the time of the Chapter 7 conversion forward, should be charged to C.I.T., as well as certain expenses (such as changing the locks) made to ensure the assets were not pilfered or damaged. The press, a physically-large machine, could not be easily moved, and with it at A & A's office were stored the rest of the assets of A & A, principally another press and supplies. C.I.T.'s press was by far the most valuable single asset of A & A, constituting roughly seventy-five per cent (75%) of the estate. Furthermore, it appeared that all the estate's property was encumbered, leaving no general estate to pay post-petition administrative expenses.

C.I.T. contested the charges, arguing that the press should have been released to it months earlier, and that the expenses did not benefit it under the meaning of 11 U.S.C. § 506(c). The bankruptcy judge assessed a portion of the rental and security expenses ($2,000.00) against C.I.T., in rough proportion to the press's value to the entire estate, calling the sum a "service charge":

> We're getting in an area which is more controversy [than] any field I know of as to how much you can charge or how much goes against the mortgage holder. I feel like you ought to pay a little.

When I say a little, I'm going to allow two thousand dollars for preservation. You can cite cases all day, ever side of the road you think of, but I don't know—never have learned yet how to handle it. So I'm going to give—require a two thousand dollar service—I'll call it service charge. . . .

Record 97 at 14. Neither the court's statements at the abandonment hearing nor its subsequent written order gives its rationale for how it arrived at the $2,000.00 charge, or how it determined that the expenses at issue were reasonable, necessary, or beneficial to C.I.T.

## DISCUSSION

This case requires the court to interpret the scope of Section 506(c) of the Bankruptcy Code. That section provides: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). This section codified existing case law under the Bankruptcy Act, S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5854, which held that, although as a general rule secured creditors were not liable for the expense of a bankrupt estate's administration, they would be liable for any expenses the estate suffered in maintaining the collateral's value or in liquidating it to cash. *In re Trim-X, Inc.*, 695 F.2d 296, 301 (7th Cir.1982); *Textile Banking Co. v. Widener*, 265 F.2d 446 (4th Cir.1959). The justification for this rule lies in the notion that the estate should not have to pay to preserve the value of property it does not own. *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr.S.D.N.Y.1982).

The issue here is whether Section 506(c) permits recovery of storage and security expenses from a secured claim holder when there are no unencumbered assets, when a secured creditor has been seeking abandonment from the initiation of the proceedings, and when the expenses protected not only the creditor's property here but all the assets of the estate. Several courts have interpreted Section 506(c) in similar situations, and though they reach their conclusion by different paths, nearly all have found that Section 506(c) is a narrow exception to the general rule that unsecured creditors bear the cost of bankruptcy administration, and that it does not permit recoupment of expenses which benefit the estate at large, but help secured creditors only indirectly.

Examination of a few cases will illustrate the point. In *In re Wyckoff*, 52 B.R. 164 (Bankr.W.D.Mich.1985), the trustee sought to recover four months' rental expense from the largest secured claim holder, arguing that the assets stored on the debtor's business premises were thereby "preserved." The court held that the creditor did not benefit from the storage expense such that Section 506(c) allowed recovery:

If not for the bankruptcy [the secured creditor] could have disposed of its collateral much sooner and at a total cost that would have enabled it to realize the amount of its claim in full. Such costs may have included a small storage fee as well as costs of sale, but clearly it would not have found it necessary to store the inventory for four months at a cost exceeding $1,200.00 per month. The only reason the trustee could have had for incurring such an expense was the expectation of eventual benefit to unsecured creditors. This is not a permissible reason for surcharging a secured creditor.

*Id.* at 168. A type of expense that is recoverable under Section 506(c), the *Wyckoff* court noted, was that associated with liquidating inventory, a cost which a creditor would have borne had he foreclosed on the property himself. *Id.*

In *In re Trim-X, Inc.*, 695 F.2d 296 (7th Cir.1982), the trustee has similarly tried to assess a secured creditor with the rental expense of the debtor's estate for the premises where the secured assets were stored. Although the Seventh Circuit acknowledged that receiving one's collateral unharmed is a benefit of sorts, it is not the sort which opens up the creditor to Section

506(c) liability, unless the creditor by some delay in acquiring possession causes those storage charges to be incurred. *Id.* at 301.

The Ninth Circuit bankruptcy panel in like manner has found that Section 506(c) requires more than incidental benefit to the secured creditor. *In re Sonoma V*, 24 B.R. 600 (Bankr. 9th Cir.1982). There, the trustee had successfully fended off a mechanic's lien claim which would have taken priority over all other creditors, and then sought recovery of his litigation expenses, arguing the benefit of preservation of the assets. The court held that Section 506(c) contemplated compensation for expenses that *directly* preserved or protected collateral, and that litigation expenses were of a general administrative nature that benefitted the estate as a whole, providing no basis for recovery. *Id.* at 604. *See also In re Flagstaff Food Service Corp.*, 739 F.2d 73 (2d Cir.1984) (litigation expenses in seeking Chapter 11 relief did not benefit secured creditors).

■ These cases stand for the proposition that the expenses which benefit the entire estate, such as those for the debtor's business lease, cannot be shifted from the debtor's estate to the secured creditors under the rubric of "cost of preservation." Section 506(c) does not convert ordinary administrative expenses into preservation costs through a broad definition of benefit. *In re Trim-X, Inc.*, 695 F.2d at 301; *In re Codesco, Inc.*, 18 Bankr. at 230. Such an exception would swallow the rule that lien creditors are supposed to pass through bankruptcy "unaffected." H.R.Rep. 598, 95th Cong., 2d Sess. 357 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6313.

■ After what has been said, it should be clear that the rental and security expenses charged against C.I.T. here were administrative expenses of the estate not chargeable to the secured creditors, as they were incurred for the benefit of all creditors and not just C.I.T. If the press had been in C.I.T.'s possession the debtor's rental expense would still have accrued, thus making it difficult to say that the

expense was caused by the presence of the press in the debtor's hands. A different result would obtain if the press had required routine maintenance or inspection to retain its value, as that expense would have benefitted only C.I.T. As it stands, however, the press merely by remaining in the estate's possession did not cause the estate to make any additional payments for the benefit of C.I.T. As a consequence, Section 506(c) does not permit charging C.I.T. with any portion of the rent or security expenses, and the Bankruptcy Court's order to the contrary was error.

■ The trustee argues, however, that the normal rules governing who pays the costs of bankruptcy administration do not apply when there does not exist, as here, any unencumbered estate out of which administrative expenses may be paid. Equitably, the trustee maintains, the secured creditor ought to be responsible for some portion of the bankruptcy proceeding, in order that it not fail from the start.

The trustee relies chiefly on a bankruptcy court decision from the Eastern District of Virginia for the proposition that Section 506(c) permits allocating costs of administration to secured creditors to the extent of "rough justice." *In re Bob Grissett Golf Shoppes, Inc.*, 50 B.R. 598, 604 (Bankr.E.D. Va.1985) (quoting *In re Proto-Specialties, Inc.*, 43 B.R. 81, 83 [Bankr.D.Ariz.1984]). That case discusses much of the case law treated here, and at one point acknowledges that

[t]he fact that the estate has no unencumbered assets from which to pay administrative expenses does not obligate a secured creditor to fund these expenses. The secured creditor, unless he consents, 'cannot be compelled to finance a chapter 11 proceeding except to the limited extent provided for in section 506(c).'

*Id.* at 604 (quoting *In re S & S Industries, Inc.*, 30 B.R. 395, 399 [Bankr.E.D.Mich. 1983]). Yet, two paragraphs later, the bankruptcy court turns 180 degrees and quotes a pre-Code case for the argument that "[w]here ... there are no unencum-

bered assets available to fund administrative expenses, the court should 'balance the misfortune of having some allowances go unpaid against the possible inequity of charging them all against mortgaged property.'" *Id.* (quoting *First Western Savings and Loan Assoc. v. Anderson*, 252 F.2d 544, 548 [9th Cir.1958]). The same pre-Code case is relied on earlier for the statement: "The courts have discretion to determine when and how much recovery shall be allowed from a secured party." *Id.* at 603.

Whatever latitude courts may have had to tax secured creditors under case law before enactment of the Bankruptcy Code is now dramatically circumscribed by Section 506(c). Rather than permitting the balancing of vague hardships, that section sets forth objective criteria which must be met before secured parties are made to cough up funds. To the extent that the holding of *Bob Grissett Golf Shoppes* deviates from these criteria, the court disagrees with it here.

Furthermore, the trustee's argument that secured creditors should contribute to an estate's administration absent other available funding misconceives a basic policy goal inherent in the Bankruptcy Code and in Section 506(c). That policy discourages a broad reading of Section 506(c) so as to sweep into its scope expenses of the estate that are sought to be recovered here. Bankruptcy, as a collective proceeding, first attempts to stop the destructive grabbing of assets that secured creditors, upon seeing that the ship is sinking, are apt to attempt, thereby making an economic recovery impossible; and secondly attempts to rekindle the little economic miracle of wealth production, by employing the estate's capital assets to create income and profits for the estate without a corresponding diminution in the value of those assets. If this second goal is successful, an effective reorganization of the business takes place, or if not at least some funds are created, without taking from anyone else, to pay unsecured creditors on liquidation.

If, however, the use of the estate's assets does not produce profits (as when income just covers the cost of raw materials) or such use results in a greater diminution of value of the capital assets (through excessive wear and tear that is not repaired) than the increase in value spawned by wealth production, then bankruptcy serves little purpose other than to provide an orderly distribution of the assets to the creditors. The familiar metaphor of a pie is instructive: if the assets are capable of wealth production, the pie of the estate grows larger of its own accord, so that eventually slices can be cut to pay off creditors without reducing the size of anyone else's slice. If there is no wealth production, on the other hand, the pie stays the same, and if the estate continues to run and pay expenses the pie actually shrinks. The best solution then clearly is to slice it up when large and send everyone home. As is clear from the Bankruptcy Code's provisions for adequate protection of lien creditors while the estate holds their assets, it is not the policy of the Code to reslice the asset pie in favor of the unsecured creditors. 11 U.S.C. §§ 363(e) and 364(d).

Section 506(c) is a consonant part of this scheme. It attempts to return to the secured creditor the portion of the asset pie he would have received had there been no bankruptcy, and no larger. Neither does it permit taxing the secured creditor's claim to finance an unwise attempt at reorganization. To explain, a debtor's estate should not be administered and run unless it can generate funds with which to pay the costs of its administration, and then some. As unsecured creditors are the primary beneficiaries of an attempt at using the assets to generate extra funds, they foot the bill even if the attempt fails. *In re Trim-X, Inc.*, 695 F.2d at 301; *Robinson v. Dickey*, 36 F.2d 147 (3d Cir.1929). If the assets are completely encumbered, and if they cannot create extra funds, administering the estate is pointless, and creates expense that leeches the wealth currently in the estate.

Thus to encourage the prompt distribution of the estate in such a circumstance, there is no provision for payment of administrative expenses when there are no unencumbered assets. Section 506(c) should not be read to provide an avenue of retarding liquidation when liquidation is called for, nor to provide a means of wealth transfer from secured to unsecured creditors. *See generally* T. Jackson, *The Logic and Limits of Bankruptcy Law* 187–89 (1986).

This is not to say that the court finds fault with the trustee's corralling and retention of A & A's assets here in order to attract a better crowd of buyers at auction. It is this kind of collective procedure that maximizes the potential value of the whole estate, which bankruptcy encourages.[1] Still, in circumstances such as these the trustee ought to proceed quickly to liquidation once the assets are collected. The rule the trustee urges would discourage this goal, as under such a rule the longer he can administer the estate, the more he can collect from secured assets to the benefit of other creditors who have been given a raw deal by the debtor. That amounts to reslicing a shrinking pie and makes all bankruptcy participants losers.

Consequently, the court concludes that the usual rules governing Section 506(c) apply with equal force to an estate without unencumbered assets. For the reasons discussed above, the Bankruptcy Court's assessment against C.I.T. in this case was erroneous, and the court will reverse the Bankruptcy Court's order charging C.I.T. with $2,000.00 of preservation expenses. The court will further remand this case to the Bankruptcy Court with instructions that C.I.T. recover $2,000.00 from the debtor's estate, and for any other proceedings the Bankruptcy Court deems appropriate.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

---

1. One might argue here that it does very little good to "encourage" maximizing the estate before liquidation if the expenses of maximizing— *e.g.*, collecting and safeguarding the assets, advertising, hiring an auctioneer, etc.—cannot be paid for. But these expenses, and any other reasonable and necessary expense of preserving and disposing of assets, are precisely what *can* be paid for through Section 506(c). That section is, of course, limited by the proviso that only expenses which benefit the secured creditors may be recovered, which limit prevents recovery here.