In re PROVIDENT HOSPITAL & TRAINING ASSOCIATION, an Illinois Not-For-Profit Corporation, doing business as, Provident Medical Center & Provident Hospital, Debtor.

PROVIDENT HOSPITAL & TRAINING ASSOCIATION, Plaintiff,

v.

GMAC MORTGAGE COMPANY OF PENNSYLVANIA, State Treasurer of the State of Michigan, and United States of America, Defendants.

Bankruptcy No. 87 B 11069.
Adv. No. 87 A 892.

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 7, 1987.

James A. Chotz and Deborah L. Thorne, Antonow & Fink, Chicago, Ill., for debtor.

Anton R. Valukas, U.S. Atty., John S. Brennan, Asst. U.S. Atty., Chicago, Ill., for U.S.

J. Samuel Tenenbaum and David J. Eckert, Becker & Tenenbaum, Chicago, Ill., for GMAC Mortg. Co. of America.

David J. Fischer and Deborah K. Ebner, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Official Unsecured Creditors' Committee.

## MEMORANDUM AND OPINION

ROBERT E. GINSBERG, Bankruptcy Judge.

### JURISDICTION

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

### FACTS

The facts in this case are simple, and with one exception, uncontested. On August 1, 1978 Provident Hospital & Training Association ("Provident") entered into a loan agreement with Mercantile Mortgage Company ("Mercantile"), pursuant to which Mercantile made a loan to Provident in the amount of $13,750,000, for the construction of a new hospital. At the time of the loan, Mercantile took three different steps to protect itself in connection with this loan. First, the parties executed a security agreement (the "First Security Agreement"). This First Security Agreement provided Mercantile with a security interest in, *inter alia*, the following:

> All of the goods, equipment, furniture, furnishing, fixtures, receivables to the extent permitted by law, chattels and articles of personal property, including without limitation ... all other items or like property and all accounts and contract rights covering or relating to any or all thereof, whether now in existence or hereafter arising....

In addition to the First Security Agreement, Provident also executed, as additional security for Mercantile, a real estate mortgage note in the principal amount of $13,750,000, pledging the hospital building and land as security for the loan. Finally, the note was insured by the United States Department of Housing and Urban Development ("HUD") to the extent of advances approved by the Secretary of HUD during construction of the hospital.

On the same date Mercantile loaned an additional $14,415,314 to Provident. As security for this second loan, Provident executed a second mortgage note in the principal amount of $14,415,314 and a second security agreement (the "Second Security Agreement"). This second loan was insured by the United States Department of Health, Education and Welfare, which subsequently became the United States Department of Health and Human Services ("HHS"). The Second Security Agreement gave Mercantile a junior security interest in the same collateral described in the First Security Agreement. Provident also gave Mercantile a second mortgage on its realty to further secure the junior loan.

On August 8, 1978, Mercantile filed financing statements with both the Illinois Secretary of State and the Cook County Recorder of Deeds in order to perfect its security interest in the collateral described in both the First and Second Security Agreements, pursuant to Ill.Rev.Stat., ch. 26, para. 9–302. In 1979 Mercantile assigned the HHS insured mortgage note and Second Security Agreement to the State Treasurer of the State of Michigan ("Michi-

gan")[1]. On June 1, 1983 Michigan filed a continuation statement for the original financing statement with the Cook County Recorder of Deeds as to the collateral described in the Second Security Agreement[2]. On December 7, 1984 Michigan filed a new financing statement with the Illinois Secretary of State to reperfect the Second Security Agreement.

On May 14, 1984 Provident and Mercantile executed an amendment to the First Security Agreement (the "Amendment"). The Amendment provided Mercantile with additional security, but in no way restricted the content of the First Security Agreement. Mercantile filed a new financing statement with the Illinois Secretary of State, on December 7, 1984, to perfect its interest in the collateral described in the Amendment (the "1984 Financing Statement"). The Amendment and 1984 Financing Statement contained essentially the same description of collateral as was contained in the First Security Agreement. The 1984 Financing Statement specifically referenced the First Security Agreement and the Amendment. Thus, at this point in time, December 7, 1984, both the First and Second Security Agreements were fully perfected. In January of 1985 Mercantile assigned its interest in the First Security Agreement and HUD insured mortgage note to Colonial Mortgage Service Company ("Colonial"). GMAC Mortgage Company of Pennsylvania ("GMAC") subsequently purchased Colonial and thus acquired the HUD loan.

On July 29, 1987 Provident filed a petition under Chapter 11 of the Bankruptcy Code. On the same day the Court granted Provident an order allowing it to use cash collateral under section 363(c) of the Bankruptcy Code on a temporary basis. The order gave GMAC and Michigan replacement liens in receivables as protection for their security interests to the extent either of those entities had a lien in Provident's property which would constitute cash collateral. The Court subsequently entered further orders allowing Provident to continue to use cash collateral on an interim basis. These orders also granted GMAC and Michigan replacement liens on the same basis.

Provident has filed a complaint for declaratory judgment against GMAC, Michigan and the United States of America[3] (the "U.S."). The complaint alleges that neither GMAC nor Michigan has a security interest in Provident's accounts receivable and therefore, neither creditor can restrict Provident's use of its receivables and the proceeds thereof since such are not cash collateral under section 363 of the Bankruptcy Code. Provident and GMAC have filed cross motions for summary judgment on Provident's complaint[4]. The only fact in dispute is the amount of Provident's receivables, which consist of claims against the United States Government. For reasons explained below, this dispute is irrelevant.

## DISCUSSION

Provident offers five arguments in support of its motion for summary judgment[5]. First, Provident argues that GMAC is an unsecured creditor because the original financing statement filed in 1983 lapsed. Provident's next contentions are that the security interest conveyed by the Amendment is unenforceable because no value was given in exchange for the security

---

1. Michigan acquired the loan as an investment for certain state pension funds.

2. None of the other original financing statements filed in 1978 was ever continued. Neither Michigan nor GMAC ever filed continuation statements with the Illinois Secretary of State. Both Michigan and GMAC filed new financing statements with the Illinois Secretary of State during 1984.

3. The United States of America is named as a defendant in its capacity as guarantor of the two mortgage notes.

4. The United States is co-movant on GMAC's motion. Michigan has not yet answered Provident's complaint.

5. The Unsecured Creditors' Committee has also filed a memorandum in support of Provident's motion and in opposition to the United States' and GMAC's motion. All references to Provident's arguments include those arguments made by the Unsecured Creditors' Committee.

interest and that the conveyance of a security interest by the Amendment is avoidable as a fraudulent conveyance. Provident's fourth argument is that even if GMAC is a secured creditor as a result of the First Security Agreement, the description of collateral was not adequately identified in that agreement and no interest in after-acquired accounts receivable was conveyed under that agreement (or perfected by the 1984 Financing Statements). Finally, Provident argues that the Federal Anti-Assignment Act, 41 U.S.C. § 15, limits or voids GMAC's security interest in any receivables due to Provident from the United States. For the reasons that follow the Court finds that all of Provident's contentions fail, and that summary judgment should be granted in favor of the U.S. and GMAC.

A brief review of the basics of secured transactions under Article 9 of the Uniform Commercial Code (the "UCC") will aid in addressing Provident's arguments. A security agreement is a contract, which is "[e]ffective according to its terms between the parties, against purchasers of the collateral and against creditors." Ill.Rev. Stat., ch. 26, para. 9–201 (1986). The collateral which a creditor claims a security interest in must be described in the security agreement. "[A]ny description of [collateral] is sufficient, whether or not it is specific, if it reasonably identifies what is described." Ill.Rev.Stat., ch. 26, para. 9–110 (1986). Under Article 9 of the UCC a security interest becomes effective between the debtor and the secured lender when it "attaches". A security interest attaches when:

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ... and

(b) Value has been given, and

(c) the debtor has rights in the collateral. Ill.Rev.Stat., ch. 26, para. 9–203 (1986).

However, what a secured lender wants is a security interest which is not only good against the debtor, but which is also good against others who might try to acquire superior interests in the same collateral, such as the debtor's other creditors or purchasers of the collateral. In other words, the secured lender wants not only a security interest good against the debtor in order to reduce the risk of the loan by providing a specific piece of property, the collateral, from which the lender can obtain payment in the event the debtor fails to pay in accordance with the loan agreement, but the secured lender also wants priority over all others in that collateral. That priority is obtained by the secured creditor taking the steps required to "perfect" its security interest in the collateral.[6]

There are several ways a security interest can be perfected, including the filing of an appropriate financing statement with some central recording office, the secured creditor taking possession of the collateral, or even, in certain circumstances, automatic perfection which requires no affirmative steps by the creditor to perfect the security interest. In general, the method or methods which may be followed to perfect a security interest depend on the nature of the collateral. *See* Ill.Rev.Stat., ch. 26, paras. 9–302, 9–304, 9–305 (1986). In the case of accounts receivable of an Illinois debtor, a security interest is perfected when a proper financing statement is filed with the Illinois Secretary of State. *See* Ill.Rev. Stat., ch. 26, paras. 9–103(3), 9–401 (1986). The financing statement must be continued from time to time, in accordance with state law, in order for the secured party to maintain its perfected status. Ill.Rev.Stat., ch. 26, para. 9–403(2) (1986). If the financing statement is not continued within the time required by law, its effectiveness as a notice of security interest to third parties

---

**6.** That is not to say perfection of a security interest in collateral will effectively insure a secured creditor's priority against all persons who subsequently acquire interests in that same collateral. In certain situations, there is nothing a secured lender can do to protect its security interest, e.g., against buyers in the ordinary course of a debtor's business. *See* Ill.Rev.Stat., ch. 26, para. 9–307(1) (1986).

lapses. Ill.Rev.Stat., ch. 26, para. 9–403(2) (1986).[7]

■ There is no doubt that perfection of both the GMAC and Michigan Security interests lapsed when both failed to file continuation statements with the Illinois Secretary of State in 1983.[8] However, Provident contends that the failure to continue the original financing statement made the lenders unsecured. As a matter of law, this is simply untrue. GMAC's security interest attached against Provident in 1978 when the loan was made and the First Security Agreement was executed.[9] When GMAC failed to continue the initial financing statement its security interest became unperfected; its loan did not become unsecured. As between Provident and GMAC, the First Security Agreement between Provident and GMAC remained unaffected by the failure to continue the financing statement beyond the initial five year period. The First Security Agreement continued to give GMAC a security interest in Provident's personalty even in the absence of an effective financing statement. *See* Ill.Rev.Stat., ch. 26, para. 9–203 (1986). The Amendment and the new 1984 Financing Statement simply served to re-perfect GMAC's security interest against other creditors of Provident. However, vis a vis Provident, GMAC has been a secured creditor continuously since 1978.[10]

■ This analysis also disposes of Provident's second and third arguments, i.e., that in 1984 when Provident agreed to an amendment of the First Security Agreement and signed a new financing statement with both lenders, such transactions were ineffective because no new consideration was given and that the 1984 transactions were voidable and in addition the 1984 transactions were avoidable as fraudulent conveyances under Illinois law because of the lack of value given. As to the collateral covered by the First and Second Security Agreements, the short answer to both arguments is that there was no transfer of any interest in Provident's property in 1984. As far as Provident was concerned the lenders were secured before the 1984 transactions and after the 1984 transactions by the same collateral given by the First and Second Security Agreements. Therefore, there were no transfers as to that collateral requiring additional consideration and no conveyances to be set aside as fraudulent. The point is that under nonbankruptcy law, re-perfections of a lapsed financing statement involve no transfer of any property of the debtor. It is unclear whether the Amendment gave GMAC additional collateral. However, even if it did, the result is the same. By definition, value is given if collateral is obtained to secure a pre-existing debt. Ill. Rev.Stat., ch. 26, para. 1–201(44) (1986).

■ Again the debtor seems to be confusing state law and bankruptcy law. It is true that for preference purposes, a transfer is deemed to occur at the time of re-per-

7. In Illinois, the effectiveness of the filing of a financing statement lapses after five years unless a continuation statement is filed during the six months preceding the expiration of the five year period. Ill.Rev.Stat., ch. 26, para. 9–403(2) (1986).

8. Michigan's filing of a continuation statement with the Cook County Recorder of Deeds in 1983 would not suffice to prevent the lapse in the perfection of its security interest upon expiration of the financing statement filed with the Illinois Secretary of State.

9. The analysis is identical for Michigan. For convenience, the references in the text will be to GMAC, although the steps were actually taken by GMAC's predecessors.

10. The argument advanced by Provident confuses the powers of a debtor in possession under section 1107 of the Bankruptcy Code with the rights of a debtor under state law. It is true that an unperfected security interest will not stand up against a debtor in possession in a Chapter 11 case. *See* 11 U.S.C. § 544(a) and Ill.Rev.Stat., ch. 26, para. 9–301 (1986). However, a debtor outside of bankruptcy cannot avoid an unperfected security interest. *Cf.* Ill. Rev.Stat., ch. 26, para. 9–301 (1986). Both of these security interests were re-perfected by filing new financing statements on December 7, 1984, long before Provident's July, 1987 Chapter 11 petition was filed. Because these security interests were validly perfected at bankruptcy, there is nothing the debtor in possession can do about them under section 544(a) of the Bankruptcy Code. *See Lewis v. Manufacturers National Bank of Detroit*, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961) (decided under the Bankruptcy Act of 1898).

fection of a security interest where perfection has previously lapsed. This is true because for preference purposes, a transfer of an interest in personal property is deemed to take place when perfected against a levying creditor. 11 U.S.C. § 547(e)(1)(B). That occurs when the security entered is re-perfected, since while it was unperfected a levying creditor could have obtained rights in the collateral superior to those of GMAC or Michigan. Ill. Rev.Stat., ch. 26, para. 9–301 (1986). *See In re Vodco Volume Development Co., Inc.*, 567 F.2d 967, 971 (10th Cir.1977) (decided under the Bankruptcy Act of 1898). So, what really happened here in 1984 was a preferential transfer. Unfortunately for Provident, the transfer took place, for purposes of section 547 of the Bankruptcy Code, on December 7, 1984 when new financing statements were filed with the Illinois Secretary of State, a date some two and one half years before the petition. Therefore, the debtor cannot avoid the preference under the Bankruptcy Code. *See* 11 U.S.C. § 547(b)(4) (transfer must be made within 90 days of the filing of the bankruptcy petition). There is no provision of Illinois allowing for the avoidance of a preferential transfer which cannot be attacked as a fraudulent conveyance. Therefore, Provident can find no relief in section 544(b) of the Bankruptcy Code.

 Provident next argues that even if GMAC is a secured creditor the description of the collateral as to after-acquired receivables is not adequate and therefore GMAC has no rights in Provident's after-acquired receivables. The Illinois approach (and the UCC approach in general) was clearly expressed by one Illinois court, commenting on Ill.Rev.Stat., ch. 26, para. 9–110, and noting that the statute allowed for a very broad description of collateral in security agreements. *Midkiff Implement Co. v. Worall*, 116 Ill.App.3d 546, 71 Ill.Dec. 655, 657, 451 N.E.2d 623, 625 (1983). *See* Ill. Rev.Stat., ch. 26, para. 9–110 (1986).[11] The language of the First Security Agreement clearly grants an interest in "[a]ll ... receivables to the extent permitted by law ...". Provident contends that this language is insufficient to convey any interest in its post loan accounts receivable.[12]

Provident first argues that the language in question is insufficient to convey an interest in any of Provident's accounts receivable because the proper "term of art" is "account receivable" and therefore the word "receivable" in the First Security Agreement must refer only to a receivable created by the sale of fixtures or personal property described in the First Security Agreement.[13] This argument is without merit. The description of collateral in the First Security Agreement refers to all receivables. As previously noted, the test under Article 9 of the UCC is one of reasonable identification, not use of term of art. The word "receivables" is a commonly used synonym for "accounts receivable". *See, e.g.*, 11 U.S.C. § 547(a)(3). There is no doubt that a reasonable person reading the security agreement and financing statement would conclude that the lenders had a security interest in Provident's accounts receivable. Article 9 was not designated to invalidate secured transactions by laying traps in the form of technicalities and magic words.[14]

Provident goes on to allege that even if the language of the security agreement does give the lenders a security interest in Provident's accounts receivable, that interest was confined to those receivables in existence at the time of the security agree-

---

11. See also the Illinois Code Comment to Ill. Rev.Stat., ch. 26, para. 9–110 (1986) (a "[d]escription reasonably identifies what is described' if it describes the property so as to distinguish it from any other property with which it might be confused").

12. Of course, again, the analysis is the same for GMAC and Michigan.

13. It appears that what Provident is really talking about is "proceeds". *See* Ill.Rev.Stat., ch. 26, para. 9–306(1) (1986).

14. By the same token, it would strain credulity to suggest that it was not the intention of Provident to give, and the lenders to get, a security interest in Provident's accounts receivable at the time the First and Second Security Agreements were entered into. The plain language of those agreements dictates the opposite conclusion.

ment, all of which presumably have long ago been collected or are uncollectable, and does not extend to after acquired receivables. There are several answers to this argument. First, the Court believes that the phrase "whether now in existence or hereafter arising" in the First and Second Security agreements modifies everything that went before it, including "receivables".[15] Certainly a reasonable third party reading this security agreement as a whole would not lend against Provident's post-1978 receivables unless it was willing to take a third position behind GMAC and Michigan.

Logic strongly suggests that the parties intended to include future receivables in the collateral. One can hardly imagine that the lenders wanted only existing receivables as security for the approximately $28 million dollars they were lending Provident to build a new hospital. In effect, if that were true, the lenders would have been lending against receivables generated by the old hospital, which receivables would quickly be used up, and were not seeking any interest in the receivables generated by the hospital they were lending Provident the money to build. Such a proposition is preposterous and lends credence to the Court's interpretation of the security agreement. In fact, the same logic leads the Court to conclude that the phrase "receivables to the extent permitted by law" alone is sufficient to convey as security interest in present and future accounts receivable. *See, American Employers Insurance Co. v. American Security Bank, N.A.,* 747 F.2d 1493, 1500–01 (D.C.Cir. 1984).[16]

Finally, Provident alleges that the Federal Anti–Assignment Act, 41 U.S.C. § 15, limits or destroys GMAC's security interest in Provident's accounts receivable. The Anti–Assignment Act prohibits the assignment of receivables or interests in receivables due from the federal government to an assignor of an interest in such receivables such as Provident without notice to the appropriate government agency. 41

---

**15.** The collateral description in the First and Second Security Agreements is as follows:

All of the goods, equipment, furniture furnishings, fixtures, receivables to the extent permitted by law, chattels, and articles of personal property, including without limiting the generality of the foregoing, all gas and electric fixtures, engines and machinery, radiators, heaters, furnaces, heating equipment, steam and hot water boilers, stoves, ranges, dishwashers, kitchen equipment and apparatus, elevators and motors, bathtubs, sinks, water closets, basins, pipes, faucets and other plumbing and heating fixtures, mantels, refrigeration plant and refrigerators, whether mechanical or otherwise, cooling apparatus, laundry equipment and apparatus, furniture, shades, awnings, screens, blinds, air conditioning and ventilating equipment, machinery and vents incinerators, telephone systems, carpets, ovens, ventilator hoods, garbage disposals, storm windows and doors, built-in cases and counters, coolers and ice making equipment, hospital beds and equipment, physiotherapy equipment, medical equipment and apparatus, all other equipment, goods and personal property as are commonly used in the fully furnishing of and equipping of a hospital, whether personal property, inventory or fixtures, whether now owned or hereafter from time acquired by the Debtor, together with all substitutions, replacements, additions, attachments, accessories, accretions, their component parts thereto or thereof, all other items or like property and all accounts and contract rights covering or relating to any or all thereof, whether now in existence or hereafter arising, and relating to, situated or located on, or used or usable in connection with the maintenance and/or operation of hospital to be constructed on a parcel of real estate. . . .

**16.** Provident contends that Ill.Rev.Stat., ch. 26, para. 9–204, requires that a security agreement affirmatively state that after-acquired property is included. Rather, what the statute says is that a security agreement "*may* provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral." Ill.Rev.Stat., ch. 26, para. 9–204 (1986) (emphasis added). This section is permissive, not mandatory. Debtors may give, and creditors may take, "floating liens", i.e. security interests which float from present collateral to future collateral as present collateral is used up and replaced. The Official Comment to section 9–204 makes it abundantly clear that the section was merely meant to permit that which some courts had been reluctant to allow. Nothing in section 9–204 mandates an affirmative statement. The Court holds that the First and Second Security Agreement and the Amendment do what Article 9 allows in section 9–204; they give these lenders a security interest in this debtor's future receivables.

---

U.S.C. § 15(4) (1982).[17] It is unclear exactly which receivables of Provident's if any, would be covered by the Anti–Assignment Act provision. In addition, there is no evidence as to whether or not the requirements of the Act have been met, but for purposes of these motions, the Court assumes (1) the statute applies to some of Provident's receivables, and (2) its requirements have not been satisfied. The purpose of the Anti-Assignment Act is to protect the United States government's interests and relates to contracts with the federal government. Accordingly, the United States is free to waive compliance with the Anti-Assignment Act and to recognize any assignment, notwithstanding that all the requirements of the statute have not been followed. *Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 614 F.2d 740, 745 (1980). Clearly, the U.S. can waive a statute enacted for its benefit in order to assert that it has a security interest in receivables it may owe Provident. The Anti–Assignment Act is not a perfection statute in the sense that compliance with it is not required to perfect a security interest against a levying creditor. The only party able to take advantage of 41 U.S.C. § 15 is the United States. The Act itself says it applies only "so far as the United States are concerned." The debtor in possession does not succeed to the rights of the United States as an account debtor under 11 U.S.C. 544(a).[18] Thus, Provident's final argument is also without merit.

There are no genuine issues of material fact. Provident has not shown that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The U.S. and GMAC have made such a showing.

IT IS HEREBY ORDERED that Provident's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that the United States and GMAC's motion for summary judgment is GRANTED.

---

**17.** The Anti–Assignment statute argument is championed primarily by the Creditors' Committee. The Committee emphasizes 41 U.S.C. § 15(1) which requires *consent* by the United States to any assignment of an interest in a receivable due from the United States, as opposed to mere notice. Unfortunately for the Committee and Provident, section 15(1) applies only to receivables due from the United States under a contract entered into prior to October 9, 1940. There is no evidence that Provident is owed money under any contract with the United States entered into prior to October 9, 1940. Instead, the applicable provision would appear to be 41 U.S.C. § 15(2) which prohibits assignment of interests in receivables due from the United States only if the contract between the assignor and the United States prohibits such an assignment. There is no evidence of such a prohibition. However, as indicated below in the text, the issue is moot because the United States may waive application of the Anti-Assignment statute.

**18.** See also 41 U.S.C. § 15 (1982) ("All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.").