In re **CHICAGO LUTHERAN HOSPITAL ASSOCIATION, d/b/a Walther Memorial Hospital, Debtor.**

**Bankruptcy No. 87 B 970.**

United States Bankruptcy Court, N.D. Illinois, E.D.

July 20, 1988.

Daniel M. Pelliccioni, Michael L. Molinaro, Katten, Muchin & Zavis, Chicago, Ill., for debtor.

Thomas E. Raleigh, Raleigh & Helms, Chicago, Ill., Trustee.

James H. Sprayregen, Lord, Bissell & Brook, Chicago, Ill., for Unsecured Creditors Committee.

James A. Chatz, Antonow & Fink, Chicago, Ill., amicus curiae.

John H. Mahoney, Associate Regional Counsel, Chicago, Ill., for HUD.

### AMENDED MEMORANDUM, OPINION & ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

FACTS

This matter is before the Court on the application of Katten, Muchin & Zavis, ("Katten") attorneys for the Chapter 11 debtor, Chicago Lutheran Hospital Association d/b/a Walther Memorial Hospital, ("debtor") for the allowance of interim compensation and reimbursement of expenses, on the application of Lord, Bissell & Brook for final compensation for services rendered as counsel to the official unsecured creditors' committee in this case, the claim of the United States of a prior lien in the proceeds of the medical malpractice fund paid to Katten as a retainer, and the motion of Katten for leave to supplement its fee application.[1]

The debtor operated a 212 bed not-for-profit hospital in an economically-disadvantaged area of Chicago's inner city. The debtor served primarily low income and elderly patients. On November 1, 1978, the debtor signed a note and mortgage in the amount of $9,013,700.00 in favor of BMFC, Inc. ("BMFC"). The mortgage was on the main hospital building and some, but not all of several other parcels of realty owned by the debtor. The debtor's obligation to BMFC was guaranteed by the United States Department of Housing and Urban Development ("HUD") and was further secured by a security agreement granting BMFC an interest in the debtor's personal property, including its accounts receivable, and the cash and non-cash proceeds of such collateral. Subsequently, BMFC assigned all of its rights to RIHT Mortgage Service Corporation ("RIHT"). On May 22, 1987, RIHT assigned its interest in the note, the mortgage, and the security agreement to HUD, which is now the debtor's major se-

---

1. This Court originally issued its opinion in this matter on May 24, 1988. Before that opinion was docketed it was withdrawn by Court order dated June 1, 1988 entered by the Court sua sponte when the Court determined certain aspects of its original opinion required clarification. Katten was in receipt of the original opinion and was apparently unaware of the fact that it had never been docketed and had been withdrawn when Katten filed a motion to reconsider certain aspects of the original opinion and to supplement its fee application. The arguments raised by Katten in that motion have been considered and are dealt with as required in this amended opinion.

cured creditor. In fact, it appears at this point that all of the debtor's remaining assets are subject to HUD's lien or that of the Internal Revenue Service ("IRS") except, perhaps, the malpractice fund described below.[2]

Very few of the debtor's patients carried insurance coverage. Accordingly, the debtor received most of its patient reserve through the Medicare and Medicaid programs. The debtor began to experience financial losses in 1983, attributable in part to management's inability to adjust to reduced reimbursements under these and other insurance programs. Specifically, the debtor experienced losses of $390,499.00 in 1983; $2,315,286.00 in 1984; $1,920,914.00 in 1985; and $3,363,999.00 in 1986.

On January 14, 1987, the debtor withdrew money from its self-insured medical malpractice trust account maintained at Harris Trust & Savings Bank ("Harris Bank") in order to pay some of its debts and to retain professionals for its forthcoming Chapter 11 case. That account contained $673,238.18 before total funds of $475,238.18 were disbursed as follows:

| | |
|---|---|
| $150,000.00 | to the IRS pursuant to an installment agreement dated January 7, 1987. |
| $ 75,000.00 | to debtor's operating account at the Harris Bank. |
| $ 842.75 | to Harris Bank as a Trustee's fee. |
| $249,395.43 | transferred to debtor's new operating account at American National Bank & Trust Company of Chicago ("American National"). |

At the close of business on January 14, 1987, the debtor's malpractice trust account had been reduced to some $198,000.00. That same day, the debtor paid $90,500.00 from its newly-created operating account at American National to the law firm of Katten as a retainer for Katten's services to be rendered as attorney for the debtor in a soon to be filed Chapter 11 case.

At that time, the debtor anticipated further negative cash flow of $329,006.00 in February, 1987 and $362,509.00 in March,

1987. In light of its gloomy prospects, the debtor filed a Chapter 11 petition on January 22, 1987, and continued to operate its business and manage its properties as a debtor-in-possession until March 20, 1987. On January 28, 1987, the debtor was authorized to retain Katten as its attorney in the Chapter 11 case on a general retainer with compensation to be paid pursuant to further orders of this Court.

Shortly after filing its Chapter 11 petition, the debtor requested the use of the funds in a sinking fund which had been established prepetition in connection with RIHT's mortgage. The debtor claimed that if it were allowed to use the money in the sinking fund to continue its operations it would have a positive cash flow by April 1987. The sinking fund was clearly part of HUD's collateral and thus was cash collateral. On February 16, 1987, this Court, over the objections of various creditors, authorized the debtor to use collections of accounts receivable and $300,000 of the sinking fund in order to keep the hospital in operation as an on-going entity in anticipation of a firm offer from a bona-fide purchaser for the hospital. In retrospect, that decision may not have been the wisest this Court has ever made. The debtor continued to lose copious amounts of money in its operations and none of the offers made for the hospital approached adequacy, i.e. no feasible offer was ever made for the hospital which came close to satisfying the HUD debt much less offering anything for unsecured creditors. No feasible plan was proposed by either the debtor or any plan proponent to assume the obligation to HUD, maintain the hospital operations and deal with the claims of the IRS and the debtor's other creditors. In short, the Chapter 11 case failed and failed miserably. By mid-March the debtor had lost some $700,000 of HUD's collateral in its postpetition operations during its futile reorganization efforts.[3] On March 16, 1987, this

---

**2.** The IRS has a lien against the debtor which appears to extend to those pieces of realty not covered by the HUD mortgage. The question of whether the IRS's lien extends to the malpractice fund is discussed *infra*.

**3.** Although it was clear by mid-March 1987 that the debtor's postpetition losses were large, the magnitude of those losses was not defined for the Court until the trustee filed a report prepared by his accountants several months later.

Court denied the debtor's emergency motion to use further cash collateral. Shortly thereafter this Court ordered the United States Trustee to appoint a Chapter 11 trustee in order to take the debtor out of possession of the hospital. Thomas E. Raleigh was appointed trustee and was charged with the quick and orderly shutdown of the hospital, which was accomplished by March 27, 1987.

On July 5, 1987, after extensive advertising, the trustee conducted an auction sale of certain remaining assets of the debtor's estate. The main hospital building, its equipment and three parking lots were purchased by HUD by bidding in $2,063,000 of its mortgage. The trustee continues to negotiate the sale of the hospital on behalf of HUD.[4]

On March 19, 1987, the Official Committee of Unsecured Creditors ("Creditors' Committee") filed a motion to obtain compensation and expenses for its attorneys, Lord, Bissell & Brook, ("LB & B") pursuant to section 506(c) of the Bankruptcy Code. The Creditors' Committee claimed that the secured creditors, including HUD, benefitted from LB & B's services which resulted in the continued operation of the hospital, allowing the debtor to preserve its going concern value.

On August 14, 1987, Katten filed its initial application for allowance of interim compensation in the amount of $89,477.50 for services rendered from January 22, 1987 through June 30, 1987 and $9,688.34 for reimbursement of costs incurred during that period. Katten has since filed a supplemental application seeking $14,501.00 for services rendered from July 1, 1987 through December 31, 1987, and an additional $220.90 in reimbursement of costs incurred during the same period, bringing the total requested fees and expenses to $113,887.74. Katten supports its applications with a breakdown of all services rendered listing time for 15 attorneys, five paralegals and one law clerk, for a total of 836.90 hours. Katten requests that any compensation and reimbursement it might be allowed be paid from the $90,500 unused portion of the prepetition retainer it received from the debtor's medical malpractice fund.[5] To the extent that the retainer proves inadequate to pay Katten in full for its services and expenses, Katten requests that it be paid out of the secured lenders' collateral under 11 U.S.C. § 506(c), asserting that Katten's representation of the debtor benefitted HUD and IRS.

The secured creditors, HUD and IRS, and the trustee, have each filed their objections to the payment of compensation and expenses to Katten from the collateral of the secured creditors pursuant to 11 U.S.C. 506(c).[6] HUD further objects to Katten's application of Katten's retainer to any fees and expenses allowed, claiming that it stems from a misappropriation of the medi-

---

**4.** Subsequent to the hearings on the instant applications, HUD and the trustee jointly requested the Court to set aside the sale to HUD and to sell the hospital to an outside buyer for $2,000,-000. The buyer intends to reopen the hospital as a psychiatric hospital.

**5.** After trial, Katten contended that the correct amount of its retainer unused at the time of the Chapter 11 petition is $85,611.40 not $90,500. As Katten sees it, the $90,500 should be reduced by fees it earned before the petition was filed. The problem is there is not a shred of evidence to support this conclusion. Katten has offered no evidence of what services the $4,888.60 paid for. If the amount was compensation for services rendered before the January 14, 1987 payment of the $90,500, it would be arguably preferential and could cause Katten other problems. *Cf. In re Michigan General Corp.,* 78 B.R. 479 (Bankr.N.D.Tex.1987); *In re Michigan General Corp.,* 77 B.R. 97 (Bankr.N.D.Tex.1987). If it

was for services rendered between January 14 and the January 22 filing of the petition the Court would have to determine the reasonableness of the services and charges to determine the amounts which could be deducted from the $90,500 retainer payment. In any case, the record strongly suggests that the payment of $90,500 received within eight days of the petition was intended to be a retainer in the Chapter 11 case and in the absence of any evidence that any part of it was earned prepetition, this Court will consider the entire $90,500 to be a retainer against postpetition fees.

**6.** HUD, the IRS, and the trustee all agree that Katten is entitled to compensation under 11 U.S.C. § 506(c) for its services in connection with the sale of the three small peripheral parcels of realty owned by the hospital since the proceeds of those sales did go to the secured creditors and the secured creditors consented to the sales.

cal malpractice trust account by the debtor. HUD contends that the malpractice fund was funded almost entirely with proceeds of the debtor's accounts receivable, all of which were subject to HUD's security interest. Thus, as HUD sees it, it had a lien in the malpractice fund under section 9–306 of the Illinois Uniform Commercial Code, Ill.Rev.Stat. ch. 26, § 9–306 (1987). Accordingly, HUD contends that the prepetition retainer Katten received is subject to HUD's prior lien and cannot be used to pay attorneys' fees or other costs of administration in the Chapter 11 case without satisfaction of the requirements of 11 U.S.C. § 506(c). Finally, HUD contends that even if Katten is entitled to compensation either under 11 U.S.C. § 506 or from the retainer, the amounts requested by Katten are unreasonable and should be significantly reduced.[7]

The debtor is not the only inner-city not-for-profit hospital to file a Chapter 11 petition in this district. Provident Hospital, a major institution serving the south side of Chicago, also filed Chapter 11 during 1987.[8] Due to an unfortunate draw from the random assignment deck, the Provident case was also assigned to this Court. While there are differences between the two cases, there are also some uncomfortable similarities. Perhaps the most glaring similarity between the two cases is the fact that in Provident, as in this case, the major secured creditor is the United States. In Provident, HUD has a first lien on virtually all of the debtor's assets and the Department of Health and Human Services ("HHS") has a junior lien on the same assets. The HUD and HHS liens total more than $30 million.

In the Provident case, the debtor is still in possession and trying to reorganize. Nevertheless, the debtor's attorneys in Provident, Antonow & Fink, ("A & F")

sensing a perhaps unfortunate precedent with respect to their ability to get paid in the Provident case coming out of this case, asked for and were given permission to file an amicus brief in this proceeding. A & F supports Katten's position on 11 U.S.C. § 506(c), which is hardly surprising. A & F also argues for a "rule of reason" approach to 11 U.S.C. § 506, to the effect that unless 11 U.S.C. § 506(c) is read to permit payment for professional fees and expenses incurred by debtors in good faith reorganization efforts under Chapter 11 out of secured creditors' collateral, secured creditors will have complete control in such cases and will be able to end the case at any time to the detriment of debtors and unsecured creditors simply by cutting off the flow of compensation to the debtor's professionals. As A & F sees it, unless its view of 11 U.S.C. § 506(c) is adopted, lawyers will not file Chapter 11 cases for debtors who may lack equity in their assets (a common situation) out of fear that the lawyers will be left holding the bag for their services. Needless to say, the United States and the trustee oppose A & F's view of 11 U.S.C. § 506.

Katten has requested interim compensation for the professional services it rendered as debtor's attorney from the date the Chapter 11 petition was filed, January 22, 1987, through December 31, 1987. The requested compensation totals $103,978.50. In accordance with local practice, Katten's application is organized by dividing the services rendered into categories with information supplied as to the services rendered within each category, the identity of each professional or paraprofessional rendering the services, and the cost to the estate of such services. *See In re Continental Illinois Securities Litigation,* 572 F.Supp. 931 (N.D.Ill.1983); *In re Wildman,* 72 B.R. 700

---

**7.** LB & B has adopted Katten's position on the 11 U.S.C. § 506(c) issue. Although the Court ordered that LB & B be paid a $20,000 postpetition retainer, no free assets were available to actually pay the retainer, and it was never paid. As indicated *infra,* LB & B never actually filed a fee application.

There is no issue as to the trustee's fees and expenses. HUD and the IRS have agreed from the time the trustee was appointed that all fees and expenses incurred by him and his attorneys in connection with the case would be compensable under 11 U.S.C. § 506(c). *Cf. In re Hotel Associates, Inc.,* 15 B.R. 487 (Bankr.E.D.Pa. 1981).

**8.** *In re Provident Hospital & Training Association,* 79 B.R. 374 (Bankr.N.D.Ill.1987).

(Bankr.N.D.Ill.1987). Such a presentation greatly facilitates the Court's analysis of fee applications in significant bankruptcy cases. Here, the categories of services rendered by Katten and the amounts sought for each category are as follows:

| | | |
|---|---|---|
| A. | Administration of case | $ 5,226.00 |
| B. | Dissemination of information to creditors and parties in interest | $ 6,339.50 |
| C. | Use of cash collateral | $46,085.50 |
| D. | Sale of ancillary properties | $ 2,403.00 |
| E. | Sale of hospital | $15,070.50 |
| F. | Negotiations with secured creditors | $ 3,087.50 |
| G. | Closure of hospital and transition after appointment of trustee | $ 4,942.50 |
| H. | Miscellaneous | $ 7,102.50 |
| I. | Preparation of fee application and other services relating to professional fees | $13,721.50 |

As previously noted, these fees represent the services of fifteen attorneys, five paralegals and one law clerk. Additionally, Katten requests reimbursement for expenses totalling $9,909.24 incurred during that period.

### Discussion

#### I. Jurisdiction and Procedure

This is a matter arising under sections 330 and 506(c) of the Bankruptcy ·Code, 11 U.S.C. §§ 330, 506(c). Accordingly, this Court has jurisdiction over this dispute under 28 U.S.C. § 1334(b) and the General Order of the United States District Court for the Northern District of Illinois of July 10, 1984 delegating its bankruptcy jurisdiction to this Court. *See* 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) as a matter concerning the administration of this estate, 28 U.S.C. § 157(b)(2)(K) as relating to the priority of liens, and 28 U.S.C. § 157(b)(2)(O) as affecting the liquidation of the assets of this estate.

#### II. Section 506(c) Claims

A. The first issue to be determined in this matter is which, if any, of the services rendered by Katten are compensable out of the proceeds of HUD's and the IRS' collateral under section 506(c) of the Bankruptcy Code.

 The starting point for analysis is a clear-cut general rule. It has long been accepted that in the usual bankruptcy case the administrative expenses of a bankruptcy are not to be charged against secured creditors' collateral. *Matter of Trim–X, Inc.,* 695 F.2d 296, 301 (7th Cir.1982); *In re Tyne,* 257 F.2d 310 (7th Cir.1958).[9] The

---

**9.** There should be no serious issue of Katten's standing to assert an 11 U.S.C. § 506(c) claim in this case. The statute provides that "[T]he trustee" may assert an 11 U.S.C. § 506(c) claim. Caselaw has extended that right to debtors in possession. *See In re Energy Co-op, Inc.,* 55 B.R. 957 *See* (Bankr., N.D.Ill.1985); *Matter of Reda, Inc.,* 54 B.R. 871 (Bankr.N.D.Ill.,1985). The right of counsel for the debtor to assert an 11 U.S.C. § 506(c) claim should not be lost when the debtor is taken out of possession and replaced by a trustee. This is particularly true where, as here, the trustee is not only unwilling to pursue the claim on behalf of the debtor's attorneys, but actually opposes the claim. *In re DLS Industries, Inc.,* 71 B.R. 679 (Bankr.D.Minn. 1987); *Matter of Reda, Inc., supra.* It should be irrelevant under 11 U.S.C. § 506(c) that Katten, and not the trustee, seeks compensation under 11 U.S.C. § 506(c) for services Katten rendered while the debtor was in possession. Any other approach would give the trustee unrestricted discretion as to whether a party who arguably benefitted a secured creditor is entitled to pursue a claim against the secured creditor. If the trustee is friendly to the claimant, and is willing to pursue the 11 U.S.C. § 506(c) claim on behalf of the claimant, the claimant will be able to collect assuming the 11 U.S.C. § 506(c) claim is meritorious. If the trustee alone has standing, and the trustee is hostile to the claimant, the claimant's claims will be denied without notice and an opportunity for a hearing. Such a result would raise serious due process questions. Thus, the debtor's attorneys should be allowed to pursue their 11 U.S.C. § 506(c) claims on their own. This Court, not Mr. Raleigh, should determine the merits of this claim.

By the same token, 11 U.S.C. § 506(c) should not be read to be limited to those services rendered by a trustee or trustee's professionals. It clearly applies to services rendered by a debtor in possession or professionals for a debtor in possession which benefit a secured creditor. *In re Birdsboro Casting Corp.,* 69 B.R. 955 (Bankr. E.D.Pa.1987); *Equitable Gas v. Equibank, N.A. (In re McKeesport Steel Castings Co.),* 799 F.2d 91 (3d Cir.1986). In addition it could include services rendered by others as well. For example, suppose an attorney for an official unsecured creditors committee in a Chapter 11 case is instrumental in procuring a buyer for collateral at a price that is very favorable to the secured creditor, and the case thereafter fails so that there is nothing available to compensate that attorney. To deny the attorney compensation from the collateral for those services which clearly benefitted the secured creditor would be to give the secured creditor a windfall. In effect, the secured creditor should pay for the

general rule is that the costs of administration of the estate and attorney fees for services rendered to the debtor in possession are charged against the estate. *In re Korupp Associates, Inc.,* 30 B.R. 659 (Bankr.D.Me.1983). This rule is based on the premise that the trustee represents the interests of the unsecured creditors and not the secured creditors. *Matter of Combined Crofts Corp.,* 54 B.R. 294, 297 (Bankr.W.D.Wis.1985); *Trim–X,* 695 F.2d at 301.

However, an exception to that general rule has been recognized where expenses have been incurred primarily for the benefit of the secured creditor, or where the secured creditor caused or consented to those charges. *Combined Crofts,* 54 B.R. at 297; *Trim–X,* 695 F.2d at 301. "The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs." *In re Codesco, Inc.,* 18 B.R. 225, 230 (Bankr.S.D.N.Y.1982). That exception has been codified in section 506(c) of the Bankruptcy Code, which provides: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

■ The entity seeking to recover costs under 11 U.S.C. § 506(c) bears the burden of proving that the exception is applicable. *Combined Crofts,* 54 B.R. at 297; *Korupp Associates,* 30 B.R. at 661; *Dozoryst v. First Financial Savings and Loan Association of Downers Grove,* 21 B.R. 392, 394 (N.D.Ill.1982). To recover expenses under

11 U.S.C. § 506(c), the applicant must prove that the expenses were 1) reasonable, 2) necessary, and 3) beneficial to the secured creditor. *In re Kotter,* 59 B.R. 266, 269 (Bankr.C.D.Ill.1986); *In re Loop Hospital Partnership,* 50 B.R. 565, 571 (Bankr.N.D.Ill.1985). A determination of whether the costs and expenses meet the requirements of 11 U.S.C. § 506(c) will depend upon the particular facts of each case. 3 *Collier on Bankruptcy,* ¶ 506.06 at 506–54. (15th ed. 1988).

Whether the costs sought under 11 U.S.C. § 506(c) are reasonable is often determined by a comparison of the costs to the costs which the secured creditor would have incurred in foreclosing on the property on its own behalf. *See Kotter,* 59 B.R. at 269. *See also Combined Crofts,* 54 B.R. at 297; *Codesco,* 18 B.R. at 228.

The next level of inquiry is whether the alleged expenses were necessary. " 'Necessary' costs are those which are unavoidably incurred by the trustee or debtor-in-possession in the preservation or disposal of the secured property." *Combined Crofts,* 54 B.R. at 297. The Seventh Circuit takes a very narrow approach to what is a "necessary" expense under 11 U.S.C. § 506(c). In *Trim–X, supra,* the Seventh Circuit looked to determine whether a trustee could recover, as administrative expenses, the costs he incurred in preserving property of the estate which was eventually abandoned to the secured creditor under 11 U.S.C. § 554. The Seventh Circuit held that the expenses which were incurred before the first date that the property could have been abandoned could be recovered as administrative expenses because they were necessary to preserve the property for the benefit of the secured creditor. *Id.* at 299–300. However, the court found that those

benefit it got. *See In re T.P. Long Chemical, Inc.,* 45 B.R. 278 (Bankr.N.D.Ohio 1985). *See also In re Baum's Bologna, Inc.,* 50 B.R. 689 (Bankr.E.D.Pa.1985); *In re Codesco, Inc.,* 18 B.R. 225 (Bankr.S.D.N.Y.1982). That is the purpose underlying 11 U.S.C. § 506(c). *See In re Loop Hospital Partnership,* 50 B.R. 565 (Bankr. N.D.Ill.1985); *In re Sonoma V,* 24 B.R. 600 (BAP–9th Cir.1982). Therefore, this Court will entertain the 11 U.S.C. § 506(c) claim of LB & B, the counsel to the official unsecured credi-

tors' committee in this case and determine its merits.

In addition, LB & B challenges the trustee's standing to question its right to 11 U.S.C. § 506(c) compensation. LB & B asserts that only the secured creditors affected have standing to object under 11 U.S.C. § 506(c). The trustee is a party in interest in this case under 11 U.S.C. § 1109. As such, the trustee "... may raise and may appear and be heard on any issue ..." in this case. 11 U.S.C. § 1109(b).

expenses which were incurred after the first date that the property could have been abandoned and turned over to the secured creditor were not "necessary expenses" within the meaning of 11 U.S.C. § 506(c). *Id. See also Combined Crofts*, 54 B.R. at 297.[10]

The key factor of the three factors for determining whether expenses are receivables under 11 U.S.C. § 506(c) is whether any "benefit" was received by the secured creditor. This factor is the most important because costs and expenses will not be recoverable under 11 U.S.C. § 506(c) unless they are incurred primarily for the benefit of the secured creditor. *Combined Crofts*, 54 B.R. at 297. For purposes of 11 U.S.C. § 506(c), benefit must be shown in a quantitative rather than a qualitative sense. *Dozoryst*, 21 B.R. at 394. "Any tertiary benefit received by the secured creditor, especially when it is under-collateralized, is too indefinite and remote to support the allowance of attorney's fees against the property." *In re The New England Carpet Co.*, 28 B.R. 766, 772 (Bankr.D.Vt.1983); *Codesco*, 18 B.R. at 229. Further, the secured creditor cannot be required to bear the expenses which benefit the entire estate under the theory that the expenses were incurred to preserve the assets of the estate as a whole. *See C.I.T. Corp. v. A & A Printing, Inc.*, 70 B.R. 878, 881 (M.D.N.C.1987). "Section 506(c) of the Bankruptcy Code does not convert ordinary administrative expenses into preservation costs though a broad definition of 'benefit'." *Id.*

An examination of the record before the Court indicates that at best the only services rendered by Katten which benefit-

ted the secured creditors in any way were those rendered in connection with the sale of the ancillary properties and some services rendered in connection with the transition of control of the estate from the debtor in possession to the trustee. As to the sale of the properties, the fees of $2,403 for those services appear to be reasonable and necessary, such as to allow recovery under 11 U.S.C. § 506(c). In fact, the trustee, IRS and HUD agree that such fees should be compensated from the collateral of the secured creditors. As to the services rendered in connection with the transition from the debtor in possession to the trustee, clearly certain of those services benefitted HUD by helping to preserve its collateral.[11] Thus, services such as the transfer of keys and documents and conversations regarding the status of the estate and claims are compensable.

However, Katten has failed to meet its burden of proof as to all of the other services for which it seeks compensation under 11 U.S.C. § 506(c). Katten has not shown that the continued operation of the debtor in Chapter 11 resulted in a higher realizable value for the collateral for HUD, or that Katten's actions in any way diminished the loss of value to the secured property or otherwise benefitted HUD. Rather, the evidence is clearly to the contrary. The debtor lost some $700,000 during the brief period that the hospital operated as debtor in possession. Virtually all of the money lost was part of HUD'S cash collateral. Both the debtor and Katten failed to produce an adequate purchase offer during that period to justify maintaining the debtor as a going concern. In fact, Katten's efforts in keeping the reorganization ef-

---

**10.** In *Trim–X* the trustee filed a petition to abandon the property on December 20, 1979. The secured creditor answered the petition and filed a counterclaim on January 21, 1980. Neither the answer nor the counterclaim, however, contained any objection to the proposed abandonment. The bankruptcy court entered an order approving the abandonment on February 1, 1980. *Trim–X*, 695 F.2d at 297. The court found that the first date the property could have been abandoned was January 21, 1980, the date that the trustee learned that neither the secured creditor nor any other party in interest had any objection to the proposed abandonment. *Id.* at

300. The court arrived at this conclusion notwithstanding the fact that the bankruptcy court did not enter the order approving the abandonment until February 1, 1980. *Id.*

**11.** It appears at this point that the focal point for analysis is the main hospital building and its contents. Since HUD has the first lien on that property, and since HUD's claim is far in excess of the value of the building, the IRS has no interest in that property. *See* 11 U.S.C. § 506(d).

forts alive for less than three months resulted in a substantial loss in the value of HUD's collateral rather than any discernible benefit. Katten represented its client's interest in failing to have the debtor file a petition to abandon at an early date, which would have resulted in a reduction of costs and expenses, and chose instead to try to continue to run the hospital. Such an approach was the debtor's only chance to salvage anything for itself out of a hopeless situation.

The only party benefitting from this approach was the debtor which remained in business longer than it should have, and which at least got a chance to try to salvage something from the debacle. Katten clearly did not have the secured creditors' interests in mind when it chose a course of action which used up large amounts of cash collateral. Katten cannot now collect its fees at the expense of the secured creditors after pursuing a course of action which was intended to and which in fact did benefit only the debtor. *See, e.g., Trim–X*, 695 F.2d at 301; *In re Bob Grisset Golf Shoppes, Inc.*, 50 B.R. 598, 602–603 (Bankr. E.D.Va.1985).

In addition, Katten has not proved that all of the attorney services in question were necessary to preserve or maximize the value of the secured creditors collateral. The debtor tried to reorganize but its attempt was unsuccessful. Katten's services were necessary to advocate the position of its client and assist it in reorganizing. The services provided by Katten, such as arguing for the right to use cash collateral and negotiating with HUD, were in no way necessary for the protection of HUD'S interest. They were necessary for the debtor's interests and perhaps the interests of the unsecured creditors, but that is not what "necessary" means in 11 U.S.C. § 506(c) terms. Without some showing that Katten's services were necessary to confer a benefit on HUD, the cost of those services may not be charged to the secured creditors. *Combined Crofts*, 54 B.R. at 298.[12]

Similarly, no evidence has been presented which demonstrates that the secured creditors benefitted in any way from Katten's other services. Again the record is to the contrary. The debtor lost copious amounts of money, upwards of $700,000, in its abortive reorganization effort. The money lost was virtually entirely HUD's collateral. The reorganization effort produced no buyer for the hospital. The hospital was closed. Any going concern value, if there ever was such, was lost when huge operating losses forced the closure of the hospital. HUD was left with a hulk worth a fraction of the amount of its claim. In such circumstances it would stretch credulity to suggest that the debtor's efforts to reorganize and Katten's services in connection therewith conferred any direct and quantifiable benefit on HUD. *See Dozoryst, supra; New England Carpet, supra; Codesco, supra.*

■ The bottom line is simple. Unless Katten can "demonstrate some benefit to [the secured creditors] from the unsuccessful attempt, 'fees and expenses arising from an unsuccessful Chapter 11 reorganization will generally not be allowed under § 506(c)'." *In re Birdsboro Casting Corp.*, 69 B.R. 955, 959 (Bankr.E.D.Pa. 1987), quoting *In re Baum's Bologna, Inc.*, 50 B.R. 689, 692 (Bankr.E.D.Pa.1985). The fact that had the reorganization succeeded,

---

**12.** By way of example, almost 70% of the total compensation sought by Katten falls into three categories: (1) use of cash collateral; (2) sale of the hospital operations and (3) preparation of Katten's fee application. Obviously none of these services was in any way necessary to the preservation or disposal of the collateral. Franz Kafka or Lewis Carroll would be proud of an argument that it was necessary, for the good of the secured creditor, that the debtor, over the objection of the secured creditor, use up large amounts of the secured creditor's cash collateral in a futile reorganization effort; or that it was necessary for the secured creditor's interest that the debtor, again over the opposition of the secured creditor, unsuccessfully seek to effect sales of the hospital property at prices which were inadequate to satisfy the secured creditor's claim; and finally, that it was necessary for the good of the secured creditor that the debtor's attorneys spend large amounts of time preparring briefs advocating their rights to be paid out of the secured creditor's collateral. None of these services could be regarded as being in any way necessary for the preservation or sale of the collateral.

it might have benefitted the secured creditor is not enough. Similarly the fact that the secured creditor could have benefitted had a successful buyer been produced is insufficient. Section 506(c) of the Bankruptcy Code does not contemplate that those who try to benefit the secured creditor will be compensated for those efforts from the collateral. Instead, 11 U.S.C. § 506(c) generally limits compensation from the collateral to those who actually do confer a benefit on the secured creditor in terms of preserving the collateral or assisting the secured creditor in realizing on the collateral. *Dozoryst,* 21 B.R. at 394; *New England Carpet,* 28 B.R. at 771–72; *Codesco,* 18 B.R. at 228–229.[13] Other than those few services previously identified, such as the sale of the peripheral properties or the transition to the trustee, nothing Katten did in fact conferred any benefit on HUD whatsoever.

As previously noted, there is one exception to the requirement that an actual identifiable benefit must be conferred on the secured creditor as a prerequisite to compensation from the collateral under 11 U.S. C. § 506(c). That exception is when the secured creditor expressly or impliedly consents to allowing the compensation sought to be paid out of the collateral. In other words, if the secured creditor expressly or by its actions consents to the rendition of the services in question and to the payments for those services out of its collateral, it will not be later heard to say that 11 U.S.C. § 506(c) is not available because the services in question conferred no actual benefit on the secured creditor.[14] The origins of this approach lie in pre-Code notions of "consent" and "causation" that are still relevant under 11 U.S.C. § 506(c). The basis of earlier decisions was an attempt by the courts to prevent the charging of unnecessary expenses to the estate which the secured creditor either caused or reasonably could have prevented. *See First Western Savings & Loan Ass'n v. Anderson,* 252 F.2d 544 (9th Cir.1958); *Miners Savings Bank of Pittston v. Joyce,* 97 F.2d 973 (3rd Cir.1938); *In re Louisville Storage Co.,* 21 F.Supp. 897 (W.D.Ky.1936), *aff'd,* 93 F.2d 1008 (6th Cir.1938); *Robinson v. Dickey,* 36 F.2d 147 (3rd Cir.1930); *In re Torchia,* 188 F. 207 (3rd Cir.1911). Thus, although 11 U.S.C. § 506(c) nowhere mentions consent or causation, such considerations are nevertheless relevant under the Bankruptcy Code. *See Trim–X,* 695 F.2d at 301; *In re Hotel Associates, Inc.,* 6 B.R. 108, (Bankr.E.D.Pa.1980).

Secured creditor consent for 11 U.S.C. § 506(c) purposes will not be easily implied in the absence of express consent by the secured creditor. Mere cooperation with a debtor or acquiescence in an attempted reorganization is insufficient. *In re Flagstaff Foodservice, Corp.* ("*Flagstaff I*"), 739 F.2d 73, 77 (2d Cir.1984); *S & S Industries,* 30 B.R. 395, 398 (Bankr.E.D. Mich.1983); *New England Carpet,* 28 B.R. at 772. The reason for this rule is clear. Creditor cooperation is a significant factor in a successful reorganization. That is particularly true of secured creditor cooperation. To require secured creditors to fight every step of the way in a Chapter 11 case or risk being saddled with all the costs of a failed reorganization effort under 11 U.S.C. § 506(c) would be antithetical to the purposes of Chapter 11. A secured creditor should be encouraged to work with the debtor in the reorganization effort. After all, a successful Chapter 11 case will benefit the debtor, the secured creditor, and the unsecured creditors. However, secured creditor cooperation in the reorganization effort is not the same thing as secured creditor's consent to finance the costs of the reorganization case. Such consent on

---

**13.** The Court hastens to add that the record is clear that Katten's efforts were not intended to benefit the secured creditor. Quite the contrary, Katten was the debtor's counsel and its efforts were quite properly intended to benefit the debtor. Any notion of attempts to benefit the secured creditor is, at best, an afterthought. Chapter 11 is, after all, primarily a debtor relief proceeding. The petition in this case was filed by the debtor for its own benefit, not HUD's.

**14.** Of course, even where it has consented to 11 U.S.C. § 506(c) compensation the secured creditor can still challenge the reasonableness of the amount of compensation sought, as opposed to the source of any payment allowed.

the part of the secured creditor must clearly appear from the circumstances. It will not be "lightly inferred". *Flagstaff I*, 739 F.2d at 77.

▇▇ It is not the secured creditor's burden to prove the lack of such consent. Instead, the burden lies with the party claiming such consent to establish that the secured creditor expressly or impliedly agreed to pay the expenses that party seeks to collect from the collateral. Katten has not come close to showing that HUD (or the IRS) expressly or impliedly agreed to have Katten's fees paid out of the collateral. In fact, the record is directly to the contrary. HUD fought against the debtor's use of its cash collateral, opposed inadequate sales of the main hospital building, and was otherwise dragged kicking and screaming into and through this abortive Chapter 11 case. The only expenses HUD has agreed to bear are those of the trustee and his professionals and Katten's fees in connection with the sales of the peripheral properties. There is absolutely nothing else in the entire record of this case to suggest any further consent by HUD to bear any other costs.

Because the Court finds that Katten's services were not necessary or beneficial to the secured creditors, it is unnecessary to reach the third factor which must be proved to recover fees and expenses under 11 U.S.C. § 506(c), that of reasonableness. However, in the discussion, *infra*, concerning the amount of fees to be awarded to Katten, the Court does address the issue of reasonableness.

The amicus, Provident Hospital, argues at length against *Flagstaff I, supra* and *Flagstaff II* [15] and urges this Court to use an "equitable approach" and adopt a "rule of reason" under which the debtor would get a chance to attempt a reorganization, in effect at the secured creditor's expense. [16] Under Provident Hospital's rule of reason, the potential benefits offered a secured creditor from a Chapter 11 case which might succeed could justify imposing the costs of an attempted good faith but failed reorganization on the secured creditor. [17]

There is little in the caselaw to support the approach for which Provident argues. Appellate decisions, such as *Trim–X, supra; Flagstaff I, supra* and *Flagstaff II, supra* raise serious doubts about the propriety of a equitable rule of reason approach to 11 U.S.C. § 506(c). It is true that the United States Supreme Court has ruled

---

**15.** *In re Flagstaff Foodservice Corp. ("Flagstaff II")*, 762 F.2d 10 (2d Cir.1985).

**16.** Provident Hospital recommends that. the Court use the following factors in applying its "rule of reason":

(1) the degree to which the continued operation of the debtor as a going concern maintained the value of the collateral at a higher level than would otherwise have been the case;

(2) the period for which this increased value was maintained;

(3) the opportunity thus afforded to the secured creditor to locate a better offer, whether successful or not;

(4) the reasonable likelihood that a plan of reorganization of the debtor was capable of success;

(5) the degree to which the payments to the secured creditor in a proposed reorganization plan were or would have been greater than the proceeds of the collateral in liquidation;

(6) the degree to which the secured creditor has encouraged, consented to, demanded, or opposed the continued operation of the debtor and the reorganization of the efforts of the debtor;

(7) the degree to which the services for which compensation under 11 U.S.C. § 506(c) is sought were reasonably likely to preserve to value of the collateral or otherwise to benefit the secured creditor;

(8) the degree to which the secured creditor has acted in good faith;

(9) the degree to which the debtor has acted in good faith;

(10) the degree to which innocent parties have relied upon the reorganization effort of the debtor;

(11) the degree to which the services for which compensation is sought related to the continued operations of the debtor as opposed to the reorganization of debtor; and

(12) the degree of success attained by the debtor's efforts.

**17.** Of course, the only time this rule of reason would apply is when the reorganization fails. If the Chapter 11 succeeds, there is no need for the rule of reason of 11 U.S.C. § 506(c), since by definition the debtor will be able to pay administration expenses in full on confirmation unless otherwise agreed. *See* 11 U.S.C. § 1129(a)(9).

that it is constitutionally permissible for an undersecured creditor to be required to bear some of the cost of a reorganization effort. *See United Savings Association of Texas v. Timbers of Inwood Forest Association, Ltd.*, —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). However, it requires a quantum leap to conclude that Congress did in fact intend to impose the costs of a failed reorganization effort on secured creditors in 11 U.S.C. § 506(c). Certainly nothing in the language of 11 U.S.C. § 506(c) or its legislative history suggests such a result. *See* House Report No. 95–595, 95th Cong., 1st Sess. 357 (1977), Senate Report No. 95–989, 95th Cong., 2d Sess. 68 (1978), U.S.Cong.Code & Admin.News 1978, pp. 5787, 5854, 6313.

In addition, the approach suggested by Provident Hospital is contrary to the basic rule of bankruptcy law that all valid secured claims come ahead of all valid unsecured claims, including claims for the cost of administering a bankruptcy case. Congress knows how to specify broad exceptions to this rule when it wishes. *See, e.g.,* 11 U.S.C. § 724(b). The absence of such an express exception in favor of Chapter 11 debtors' attorneys militates against the policy determination urged by Provident Hospital. It appears instead that 11 U.S.C. § 506(c) is a narrow exception confined to those activities which confer a benefit on a secured creditor and is confined to the extent of that benefit. *See Trim–X, supra; Flagstaff I, supra;* House Report No. 95–595, 95th Cong., 1st Sess. 357 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 68, (1978). If Congress wants a different policy, it should so specify by appropriate legislation.

In any event, this Court does not need to determine whether to apply Provident Hospital's rule of reason to Katten's 11 U.S.C. § 506(c) request, as even under the rule of reason arguments, Katten could not collect compensation from the collateral. Even using a general concept of potential benefits to the secured creditor, nothing in this case ever offered HUD (or IRS) any general benefit in fact or any hope of benefit. Not only did HUD fail to realize in fact any benefits from the reorganization effort, but no such benefits were potentially realizable. This case was doomed from day one. The secured creditors got nothing out of it. They could not have gotten anything out of it, as the debtor had nothing to give them. Large amounts of collateral were dissipated. The going concern value could not be preserved, if in fact this debtor had any going concern value when it filed Chapter 11. There was never any reasonable possibility that Katten's activities would enhance the amount HUD or the IRS would realize on their collateral. Under any theory, except with the limited exceptions previously noted, Katten's claims under 11 U.S.C. § 506(c) must be denied in toto.

■ B. *Creditors' Committee.* Bankruptcy Rule 2016(a) requires that any person who seeks an award of compensation from the estate must file an application for compensation with the court, detailing the services rendered, the time spent, and any expenses for which reimbursement is requested. The burden of proving the value of the services for which compensation is sought is always on the applicant. *In re Pettibone,* 74 B.R. 293, 299 (Bankr.N.D.Ill. 1987). This burden is not to be taken lightly, as "every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors." *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bankr.E. D.Pa.1981).

■ LB & B has merely filed a proof of claim in this case in the amount of "in excess of $10,000.00." [18] LB & B never filed a formal fee application. Accordingly, LB & B has failed to comply with the provisions of Bankruptcy Rule 2016(a), as it has neither specified the amount of compensation it seeks nor detailed the services rendered. Further, LB & B has failed to present any evidence to support a claim for compensation pursuant to 11 U.S.C. § 506(c). Apparently, LB & B chose to link the fate of its 11 U.S.C. § 506(c) claims to that asserted by Katten. Therefore, for

---

**18.** LB & B filed a proof of claim in lieu of a fee application in support of its request for compensation pursuant to sections 506(c) and 507(a)(1) of the Bankruptcy Code.

the reasons previously stated with respect to Katten, LB & B has failed to sustain its burden and its 11 U.S.C. § 506(c) claim must also be denied in toto.

### III. The Claim of the United States of a Prior Lien in the Proceeds of the Medical Malpractice Fund Paid to Katten as a Retainer.

■■■ HUD claims that either it or IRS had a first priority lien against all of funds in the debtor's malpractice trust account. That account was the source of the $90,500 prepetition retainer paid to Katten. Accordingly, the United States claims that the retainer is part of its collateral. Since this Court has earlier in this opinion ruled that Katten's 11 U.S.C. § 506(c) claim, for the most part, must be denied, if Katten took the retainer subject to the United States' lien claims, it cannot apply it against any compensation to which it might be entitled. On the other hand, if the retainer is not subject to the United States' liens, Katten may apply it against any compensation which the Court might award it without regard to 11 U.S.C. § 506(c). Accordingly, the Court must determine whether the United States does, in fact, have any claim against the malpractice fund.

The United States argues two bases for its lien claim against the malpractice fund. First, it contends that the money in the malpractice fund came from proceeds of the debtor's accounts receivable. HUD has a lien on all of the debtor's accounts receivable. Accordingly, it contends that under section 9–306 of the Uniform Commercial Code its lien extends to the proceeds in the malpractice funds as well.[19] Alternatively, the United States takes the position that the malpractice fund is subject to the IRS' prepetition tax lien.

While it is clear that the IRS may have once had a lien against the malpractice fund, it no longer had a lien on those funds at the time Katten took its retainer. Prior to the filing of the debtor's Chapter 11 proceeding, the IRS filed a tax lien which attached to the debtor's malpractice trust among other things. On January 7, 1987, the debtor and the IRS entered into an agreement whereby the IRS would release its lien against the fund and would be paid $150,000.00 from the surplus reserves of the malpractice trust. On January 14, 1987, the IRS released its lien on the funds of the malpractice trust and the debtor paid it $150,000.00.

On the other hand, this Court has previously held that the language of HUD's security agreement was sufficient to give it a security interest in all of the debtor's accounts receivable. See generally In re Provident Hospital & Training Association, 79 B.R. 374 (Bankr.N.D.Ill.1987). In certain circumstances, that security interest will extend to the proceeds of the debtor's receivables.[20] Testimony and evidence presented in the hearing on Katten's application indicate that the malpractice trust was funded with monies transferred from the debtor's operating account. The cash proceeds of the debtor's accounts receivable were commingled with funds from other sources, such as donations, which funds were not subject to HUD's security interests in that operating account. Accordingly, Katten asserts that HUD has failed to trace the proceeds of its receivables into the malpractice trust or, more specifically, to the $90,500.00 retainer transferred to

---

19. Section 9–306(2) of the Uniform Commercial Code provides as follows:
(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
See also Ill.Rev.Stat. ch. 26, § 9–306(2) (1987), which provides:

Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

20. See, e.g., In re Altek Systems, Inc., 14 B.R. 144, 148–49 (Bankr.N.D.Ill.1981).

Katten, and has therefore failed to establish any security interest in those funds.

In order for a security interest to continue in such proceeds, Ill.Rev.Stat. ch. 26, § 9–306(2) (1987) requires that the proceeds be "identifiable". The fact that cash proceeds have been commingled with other funds does not preclude the proceeds from being identifiable. The Supreme Court of Illinois has adopted a lowest intermediate balance rule to identify proceeds subject to a security interest under section 9–306(2). The rule is based on the idea that dollars cannot be easily identified once they are deposited into an account. *See C.O. Funk, Inc. & Sons v. Sullivan Equipment, Inc.,* 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370, 372 (1982). *See also In re Datair Systems Corp.,* 42 B.R. 241 (Bankr.N.D.Ill.1984); *Marquette National Bank v. B.J. Dodge Fiat,* 131 Ill.App.3d 356, 86 Ill.Dec. 678, 475 N.E.2d 1057 (1985). The rule presumes that proceeds can be "identified" once deposited into an account as long as the account balance is equal to or greater than the amount of the proceeds deposited, notwithstanding that other funds may be paid out of the account. *Id.*

Thus the mere commingling of funds subject to its security interest with other funds not subject to its security interest in the operating account is not necessarily fatal to HUD's claim to a security interest in the malpractice trust. However, HUD bears the burden of proving the lowest intermediate balance. The stipulated facts in this proceeding indicate that on January 14, 1987 the debtor's Malpractice Trust Account contained $673,238.18 before disbursements of $475,238.18, which left a balance of $198,000.00. HUD must show that the $198,000.00 remaining in the malpractice account at the close of business on that date was *less than* the amount of its claimed lien in proceeds in order to trace the proceeds to Katten's retainer. *C.O. Funk, supra.* HUD must present evidence of the amount of the accounts receivable portion of the operating account on January 14, 1987 in order to trace the fund to the malpractice account and on to Katten's retainer.

The Court has heard testimony and reviewed documents dating back to 1978 in this matter and has been unable to determine what that amount might be and trace it through the various disbursements made on that day which led to Katten's retainer. Therefore, as HUD has failed to meet its burden of proof, its claim of a security interest in the funds removed from debtor's medical malpractice fund on January 14, 1987 and transferred in part to Katten as a retainer are denied, and the retainer must therefore be considered an asset of the estate not subject to a lien.[21]

### IV. *Amount of Attorney's Fees to be Awarded to Katten.*

The conclusion that the United States has no lien in the retainer leads to the ultimate question in the proceeding before the Court: What amount of compensation has Katten earned in this case?

Even if no objections are raised to a fee request, the bankruptcy court is not bound to award the fees sought, and in fact has a duty to independently examine the

---

**21.** It is important to realize that a retainer remains property of the estate subject to return until earned and awarded to the attorney or other professional by court order on appropriate application, notice and hearing. An attorney takes a prepetition retainer as a form of security for fees, in effect a possessory security interest in cash. *Cf.* Ill.Rev.Stat. ch. 26, § 9–305 (1987) (perfection by possession). The cash remains the debtor's property until earned and awarded. The retainer must be fully disclosed. *See* 11 U.S.C. § 329; Bankruptcy Rule 2016. If the retainer is excessive it is subject to turnover. *See* 11 U.S.C. § 329 and Bankruptcy Rules 2017, 7001(1). Even if it is not excessive, it is still subject to turnover as property the trustee can use, sell or lease under 11 U.S.C. § 363 if the attorney can otherwise be provided with adequate protection (beyond the promise of an administrative claim) for fees to be earned in the Chapter 11 case. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Fortunately, this Court does not now have to address the thorny question of whether the attorney can use a retainer when received or must maintain it in a trust account until the fees are awarded by the Court. *See* Model Rules of Professional Conduct Rules 1.15(a), (c) and 1.16(d) (1983), ABA Model Code of Professional Responsibility Disciplinary Rule 9–102(A) (1982).

reasonableness of all fee applications. *In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D.La.1986); *In re Pettibone* 74 B.R. 293, 299–300 (Bankr.N.D.Ill.1987). Here, of course, the trustee and the United States raise serious questions about the amount of compensation to be awarded Katten. The Court has conducted extensive hearings on those objections and a great deal of evidence has been adduced by both sides.

Bankruptcy Rule 2016, which governs compensation for services and expenses, sets forth the information which must appear in a fee application. That information includes: "[A] *detailed* statement of ... the services rendered, time expended, expenses incurred and ... the amounts requested." Bankruptcy Rule 2016 (emphasis added). In all fee requests, the fee application is inevitably the starting point for analysis. It is the crucial document in any fee matter. "The primary objective of any fee petition is to reveal sufficient information to enable the Court to determine whether the services rendered were reasonable, actual and necessary." *Pettibone* at 301, citing *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 582 (Bankr.D. Utah 1985). "It is beyond question that an attorney applying for fees under any fees statute has an obligation to provide accurate and detailed records for the services for which he or she claims reimbursement." *Stickney Corp. v. Chicago Milwaukee Corp.*, 840 F.2d 1308, 1318 n. 7 (7th Cir.1988).

This Court's colleague, Judge Jack B. Schmetterer, in a well written analysis, has assembled detailed criteria to be applied in analyzing a fee application such as that submitted by Katten. *See Pettibone*, 74 B.R. at 301–04. The discussion below sets out some of those criteria.

1. *Itemized Daily Entries.* A proper fee application must list each activity, its date, the attorney who performed the work, a description of the nature and substance of the work performed, and the time spent on the work. *In re Lindberg Products, Inc.*, 50 B.R. 220, 221–22 (Bankr.N.D.Ill.1985). Records which give no explanation of the activities performed are not acceptable for these pur-

poses. *In re Affinito & Son, Inc.*, 63 B.R. 495, 498 (Bankr.W.D.Pa.1986).

2. *Particular Entries.*

*Telephone Calls.* An entry of "telephone call" or even "telephone call with Mrs. X" is insufficient. *In re R & B Institutional Sales, Inc.*, 65 B.R. 876, 881 (Bankr.W.D.Pa.1986); *In re Four Star Terminals*, 42 B.R. 419, 426 (Bankr. D. Alaska 1984). The purpose and length of the conversations, and the person called or calling, must be clearly set out. *In re NRG Resources, Inc.*, 64 B.R. 643, 653 (W.D.La.1986); *In re D. Diorio & Sons, Inc.*, 46 B.R. 648, 651 (Bankr.N. D.Ill.1985).

*Conferences.* Similarly, an entry of "conference" or "meeting", "conference with X" or "conversation with X" is insufficient. The entry should at the very least note the nature and purpose of the various meetings and conferences as well as the parties involved. *In re NRG Resources*, 64 B.R. 643 (W.D.La.1986).

*Drafting Letters or Documents.* Similar requirements apply here. Time entries for drafting documents should specify the document involved and the matter to which it pertains. *In re Baldwin–United Corp.*, 45 B.R. 381, 382 (Bankr.S. D. Ohio 1984). Time entries for drafting letters should briefly set forth the nature and substance of each letter and to whom it was sent. *In re Jensen–Farley Pictures*, 47 B.R. 557, 583 n. 29 (Bankr. D. Utah 1985).

*Legal Research.* Entries of "research", "legal research" or "bankruptcy research" are insufficient. *Four Star Terminals*, 42 B.R. 419, 435 (Bankr.D. Alaska 1984). The nature and purpose of the legal research should be noted. In addition, the entry should indicate what matter the material sought will be used in.

*Other Entries.* Time entries for other activities, such as court appearances, preparation for court appearances, and depositions should also briefly show the nature and purpose or substance of the activity.

*Pettibone*, 74 B.R. at 301–02.

 It is not overly burdensome to require that a person seeking compensation

from the bankruptcy estate adequately explain the time for which compensation is sought. The court should not have to guess or spend excessive court time to justify a fee for an applicant who has not itself done so. *Pettibone*, 74 B.R. at 302. Moreover, the court will not compensate for time which is "lumped" together in a fee application. In order for the court to determine whether time spent on an activity was reasonable, multiple services performed cannot be "lumped" under one time entry. *Pettibone*, 74 B.R. at 307; *In re Amatex Corp.*, 70 B.R. 624, 627–628 (Bankr.E.D.Pa.1985).

The United States Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424 [103 S.Ct. 1933, 76 L.Ed.2d 40] ... (1983), a nonbankruptcy matter, stated that attorneys applying to a court for statutory attorney's fees should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here." *Hensley*, 461 U.S. at 434 [103 S.Ct. at 1939] ..., quoting *Copeland v. Marshall*, ... 641 F.2d 880, 891 ([D.C.Cir.] 1980) (en banc). The standard of Bankruptcy Code § 330 that compensation be for actual and *necessary* services makes the exercise of such "billing judgment" a mandatory requirement in bankruptcy fee matters. A debtor's estate should not bear the burden of a duplication of services, and such duplication should be avoided by counsel on their own initiative by exercise of good "billing judgment". If found in the record, duplication shall be disallowed by the court as unnecessary. *In re Liberal Market, Inc.*, 24 B.R. 653, 664 (Bankr. S.D. Ohio 1982).

... 1. *Individual Responsibility.*
Generally, attorneys should work independently, without the incessant "conferring" that so often forms a major part of many fee petitions. While some intraoffice conferences may be necessary, no more than one attorney may charge for it unless an explanation of each attorney's participation is given. *In re R & B Institutional Sales, Inc.*, 65 B.R. 876, 882 (Bankr.W.D.Pa.1986).

*Pettibone*, 74 B.R. at 303. While the participation of more than one counsel is sometimes necessary in complex matters and compensation should be awarded accordingly, the Court must emphasize that there is a difference between duplication and coordination of services. *In re Holthoff*, 55 B.R. 36 (Bankr.E.D.Ark.,1985). Another example of the kind of work for which only one attorney ordinarily will be compensated is court appearances. "When more than one attorney appears in court on a motion or argument or for a conference, no fee should be sought for non-participating counsel." *Pettibone*, 74 B.R. at 303, citing *Jensen–Farley Pictures*, 47 B.R. 557, 583. An exception to this rule would be a showing of some specific reason requiring attendance by more than one attorney at a particular court hearing. *See Holthoff*, 55 B.R. at 40.

"While it is recognized that particular questions requiring research will arise from time to time, no fees will be allowed for general research on law which is well known to practitioners in the area of law involved." *Continental Illinois Securities Litigation*, 572 F.Supp. at 933. Nor are fees allowable for simply reading the work product of another lawyer as a matter of interest. *Id.*

Finally, there is the question of whether time spent preparing the fee application is compensable from the estate. There is a clear split of authority on the issue. *Compare In re Wilson Foods Corp.*, 36 B.R. 317 (Bankr.W.D.Okl.1984) with *Pettibone, supra*. This Court believes that if it is going to require detailed fee applications from professionals seeking compensation from a bankruptcy estate, those professionals should be compensated for a reasonable amount of time required to prepare and prosecute such applications. The key is, of course, what is reasonable in this regard.

In addition, in determining the extent and value of compensation to be awarded, courts generally follow the "lodestar" approach, the *Johnson*" approach, or some combination of the two. The lodestar approach, developed by the Third Circuit in 1973, first determines the amount of compensable time and then multiplies that amount by an appropriate hourly rate to obtain the base or "lodestar" figure. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 166–168 (3rd Cir.1973) ("Lindy I"). The lodestar figure may be adjusted upward or downward, depending on the facts and circumstances of the case.[22] *See, e.g., Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980); *Wildman*, 72 B.R. at 712; *In re Casco Bay Lines, Inc.*, 25 B.R. 747 (BAP–1st Cir.1982). The *"Johnson"* approach, first set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), enumerates 12 factors to be considered by the court in awarding adequate compensation.[23] These factors are based on the standards for fees for legal services set forth in the Model Code of Professional Responsibility, DR 2–106. *Pettibone*, 74 B.R. at 305–06.

In reviewing Katten's application, the Court can determine the lodestar amount despite the large number of attorneys seeking compensation and the range of experience held by them. It would be impossible to fashion a single hourly rate to apply across the board as the value of the services rendered by the Katten attorneys varies with the skills and experience of each attorney. This is particularly true when comparing a junior associate with a senior partner. The hourly fees requested range from $75.00 to $225.00. Given the range of skills required, a single blended hourly rate would be at best an artificial guesstimate. Instead, in seeking to determine an "appropriate" hourly fee, the Court finds it necessary to use several different rates for the different attorneys, and, will apply the hourly rates typically billed by each unless that amount is determined to be unreasonable for the particular services provided. The Court will analyze the compensable time for the Katten lawyers in detail later in this opinion.

Additionally, the Court has considered all of the *Johnson* factors, but found many of them to be irrelevant. Such factors as whether employment in this case precludes acceptance of other employment opportunities, the time constraints imposed by the trustee or the circumstances of the case, the unattractiveness of the case, and the nature and length of the relationship between the professional and the trustee have little or no applicability in determining compensation to be awarded Katten. Other factors such as customary fees, including customary fees for comparable non-bankruptcy services, *see* 11 U.S.C. § 330, difficulty and novelty of the issues involved, the time and labor required, the skill required, the experience and reputation of Katten and its lawyers, and the amounts involved as well as the degree of success are relevant and will be considered. It is also worth noting that the large prepetition retainer Katten took almost entirely negated any contingency aspects of this case from its point of view.

---

**22.** These facts and circumstances include, *inter alia,* the degree of success of the case, *see In re Garland Corp.*, 8 B.R. 826 (Bankr.D.Mass.1981) and any unique contribution by the lawyer to the success or failure of the case.

**23.** These 12 factors are as follows:
(1) The time and labor required.
(2) The difficulty and novelty of issues involved.
(3) The skill required to properly perform the services.
(4) Whether employment in the case precluded acceptance of other employment opportunities.

(5) The customary fee for the services.
(6) The time constraints imposed by the trustee or the circumstances of the case.
(7) Whether the fee is contingent.
(8) The amounts involved and degree of success.
(9) The experience, reputation and ability of the professional.
(10) The unattractiveness of the case.
(11) The nature an length of the relationship between the professional and the trustee.
(12) The amount of compensation allowed similar professionals in similar careers.

█ This Court does not believe that this case is appropriate for an upward or downward adjustment of the lodestar amount based on the results achieved. Although the case failed, the failure was in no way due to the quality of Katten's services. While this Court will raise serious questions about the quantity of the services rendered by Katten, there is little doubt that on an overall basis the services rendered were first rate in quality. *Cf. Boston & Marine v. Sheehan, Phinney, Bass & Green,* 778 F.2d 890 (1st Cir.1985). Therefore, the result in this case would be the same for Katten regardless of whether the Johnson approach, lodestar approach, or a combination is used.

This Court has attempted to review the Katten application in detail in light of all of the foregoing. Katten's application is prepared in the proper format in terms of breakdown by category of service. *Continental Illinois Securities Litigation, supra; Pettibone, supra; In re Wildman,* 72 B.R. 700 (Bankr.N.D.Ill.1987). The Katten firm is one of Chicago's top law firms. Mr. Pelliccioni, the head of Katten's commercial/bankruptcy department is an experienced bankruptcy attorney of national reputation. Mr. Molinaro, the Katten associate who spent by far the most time of any Katten lawyer on this case, is a bright and able lawyer who is experienced both as a former clerk to a judge of this court and as a lawyer with several years experience in many bankruptcy cases throughout the country representing both debtors and creditors. The other Katten lawyer with a major time commitment to this case, Mr. Petrakis, is a commercial litigator, rather than a bankruptcy practitioner.

At the outset, the Court, with a great deal of regret and hesitance, must be forthright enough to state its observation that from virtually day one, this case appears to have been overlawyered. This is particularly true in light of the Court's view that any attempt to rehabilitate the hospital financially was fairly clearly doomed from the beginning of this case. That is not to say that Katten should be denied all compensation. It clearly rendered valuable services. The question is what is the value of those services.

The fee application shows charges for the services of fifteen attorneys, five paralegals and one law clerk charging for 836.9 hours of services rendered over a twelve month period. In many instances time is charged by more than one attorney for work which appears to require only the services of a single attorney. Among some examples of such unnecessary duplications are as follows:

1. On January 22, 1987, both Molinaro and Pelliccioni attended a press conference and billed $221.00 and $382.50, respectively.

2. On January 26, 1987, Molinaro and Pelliccioni each billed $182.00 and $315.00 respectively for 1.4 hours spent in the same conferences with the debtor and meeting with each other.

3. On February 16, 1987, Petrakis, Molinaro and Pelliccioni all attended a court hearing regarding the proposed use of the sinking fund billing $825.00, $715.00, and $1,620.00 respectively.

4. On March 12, 1987, O'Brien[24], Petrakis, Molinaro and Pelliccioni attended and billed 2.30 hours for the same court hearing regarding the proposed sale of the hospital charging $345.00; $345.00; $299.00; and $517.50, respectively.

5. On March 16, 1987, O'Brien, Petrakis, Molinaro and Pelliccioni attended the same hearing involving offers to purchase and billed $690.00; $705.00; $611.00; and $1035.00, respectively.

6. On March 20, 1987, Olson[25], Petrakis, Molinaro and Pelliccioni attended the same hearing regarding the Gateway offer and the appointment of a trustee billing $429.00; and $742.50 respectively.

---

**24.** Mr. O'Brien is a Katten partner.

**25.** Mr. Olson is a Katten associate.

These are but a few of the examples of duplication of lawyer's services indicated by Katten's fee application.

 In addition, this Court has many questions about the role Mr. Petrakis served in this case. His time entries are of little help in that regard. Many of the descriptions of services rendered by Mr. Petrakis are insufficient, as they lump multiple services together so that it is impossible to determine the reasonableness of each item or duplicate the services of other Katten attorneys, including 17 "conversations with Mr. Molinaro". Without further explanation what Mr. Petrakis contributed at these meetings, his services are deemed duplicative of those provided by Mr. Molinaro and compensation is denied accordingly. Examples of insufficient billings by Mr. Petrakis are as follows:

| | | |
|---|---|---|
| 2/10/87 | Conference with Molinaro and review statute. | 1.00 |
| 2/11/87 | Conference with Molinaro. | .40 |
| | Prepare for hearing. | 1.90 |
| 2/13/87 | Conference with Molinaro. | .50 |
| | Telephone conference with client and opposing counsel. | .60 |
| 2/13/87 | Review transcript of prior hearing. | 1.00 |
| 2/14/87 | Prepare for hearing. | 2.00 |
| | Prepare witnesses. | 4.00 |
| | Conference with Mike Molinaro. | .70 |
| 2/15/87 | Telephone conference with Molinaro. | .40 |
| 2/16/87 | Attend court hearing. | 5.50 |
| | Conference with clients and conference with Molinaro and Pelliccioni. | 1.00 |
| 2/18/87 | Conference with Molinaro. | .40 |
| 2/19/87 | Prepare for hearing. | 1.20 |
| 2/20/87 | Review memo re motion. | 1.30 |
| 2/23/87 | Review motion, read Bankruptcy Code sections. | 1.20 |
| 2/24/87 | Telephone conference with client. | .60 |
| | Prepare for hearing and review malpractice reports. | 4.30 |
| 2/25/87 | Prepare for hearing. | 2.20 |
| 2/26/87 | Telephone conference with HUD. | .60 |
| | Research re evidence. | 3.00 |
| | Review documents and prepare for hearing. | 1.50 |
| 2/27/87 | Court hearing. | 2.40 |
| | Conference with client regarding preparation for hearing. | 1.20 |
| 3/2/87 | Telephone conf. Appraiser; Conference with Pelliccioni. | 1.50 |
| 3/6/87 | Conference with Molinaro. | .50 |
| | Telephone conference with Duczynski. | .50 |
| 3/10/87 | Telephone conference with Seidel. | .40 |
| 3/11/87 | Prepare for hearing, conference with Molinaro re same. | 2.00 |
| 3/12/87 | Telephone Conference with Howley appraiser. | .30 |
| | Attend court hearing. | 2.30 |
| 3/13/87 | Telephone conference with Howley appraiser; and conference with Molinaro. | .50 |
| 3/16/87 | Conference with M. Molinaro; Telephone conference with Howley. | .20 |

| | | |
|---|---|---|
| 3/16/87 | Attend hearing. | 4.70 |
| | Prepare client. | 1.00 |
| 3/16/87 | Discussion with Pelliccioni and Molinaro over dinner. | .80 |
| 3/18/87 | Telephone conference with Felsenthal; Conference with Molinaro | .40 |
| 3/20/87 | Attend court hearing. | 3.20 |
| 12/4/87 | Discovery; Conference with Molinaro. | 1.20 |
| 12/8/87 | Telephone conference with John Brennan, Conference with Mike Molinaro. | .40 |
| 12/9/87 | Correspondence to Brennan. | .20 |
| 12/10/87 | Conference with D.P., Michael Molinaro, Review Pleadings, Draft Discovery. | 2.30 |
| 12/16/87 | Telephone conference with Brennan. | .20 |
| 12/22/87 | Review correspondence from Helms, correspondence to Helms, Conference with Mike Molinaro telephone conference with Helms. | .80 |
| 12/28/87 | Conference with Molinaro. | 1.20 |
| 12/29/87 | Review brief; Conference with Molinaro. | 1.20 |
| 12/30/87 | Discussion with Brennan, Conference with Molinaro, Review brief, Notes of relevant points from brief. | 2.80 |

The description of services rendered by Mr. Petrakis clearly lacks the detail required for compensation in bankruptcy. The Court can make a somewhat educated guess as to what some of the services rendered by Mr. Petrakis were by virtue of the categories to which the Katten firm has assigned his vague time entries, but the standard for fee awards is not an educated guess. This Court has no idea how Mr. Petrakis could confer with or prepare a corporate client. (See entry of 3/16/87 above) Obviously he met with and prepared a human being, but the Court cannot ascertain who that person might have been and why that conversation or preparation was necessary. The problems with Mr. Petrakis' attendance at hearings have previously been alluded to in connection with the references to unexplained apparent duplication of services and are discussed further in the next paragraph. Suffice it to say that the cryptic entries he has offered do nothing to allay the Court's concern that his presence at these hearings was an unnecessary luxury this estate cannot afford. His entries do not identify the subject of the hearing or suggest why his attendance was required. By the same token while he does not identify the brief he "reviewed", apparently it was Katten's brief in support of its instant application. His entries do not suggest what his "review" might have added to that brief which focuses on ques-

tions of bankruptcy law well within Mr. Molinaro's competence. It is hard to see why review by a nonbankruptcy litigator was appropriate, and Mr. Petrakis' entries add nothing to resolve the questions. Most of Mr. Petrakis' other time entries are equally not illuminating.

However a more basic question exists with respect to Mr. Petrakis which is why was he involved in this case at all. Mr. Petrakis is a partner in the litigation department of Katten, and has practiced exclusively in the area of the litigation since 1979. His involvement in this case appears to have been limited to litigation related services for the debtor. After examining the record at length, this Court can only conclude that this case could have been handled entirely by Mr. Molinaro with Mr. Pellicioni's supervision and guidance. Mr. Molinaro did not need further supervision and guidance by Mr. Petrakis.

It is true that neither Mr. Molinaro nor Mr. Pelliccioni is a member of the trial bar for this District and thus by local rule both are ineligible to try contested matters or adversary proceedings in this Court. However, such a problem could be remedied easily either by Mr. Molinaro obtaining a waiver from the Court as permitted by the local rule or by both attorneys simply taking the time to fill out the application papers. Both appear to be eligible for admission to the trial bar based on the Court's knowledge of their experience.

The point is that it appears wholly unnecessary in this case for the estate to bear the *additional* expenses of a litigator when bankruptcy counsel could clearly do the job themselves. The litigation in this case was not difficult. It required a low level of expertise to try the various issues before the Court. There were no difficult or complicated adversary proceedings to be handled. The real problems in the case involved questions of bankruptcy law (e.g. adequate protection in connection with cash collateral, interpretation of security agreements, sales of the debtor's assets, etc.).

Such matters are much more within Mr. Molinaro's and Mr. Pelliccioni's expertise than Mr. Petrakis'. In fact, it appears to the Court that other than at the fee hearing when Mr. Molinaro was a witness, Mr. Petrakis' involvement in the case was completely unnecessary.[26] A firm like Katten should be able to provide a debtor with a single lawyer who is both trial bar qualified and possesses the necessary bankruptcy law expertise to handle the type of routine bankruptcy litigation that this case involved. Accordingly, other than services rendered which do not duplicate those provided by Mr. Molinaro and which are adequately detailed, no compensation will be allowed for Mr. Petrakis' services.

In response to Katten's posttrial motion, the Court has reviewed Mr. Petrakis' time entries and will allow compensation for 12.0 hours expended by Mr. Petrakis for the preparation of identifiable witnesses for hearings. Katten argues that "if Mr. Petrakis did not prepare these witnesses, Mr. Molinaro or another attorney would have been forced to prepare them". This statement is undoubtedly correct. It also reinforces the Court's belief that the services of Mr. Petrakis, a non-bankruptcy litigation specialist, were not necessary to Katten's representation of the Debtor, since Mr. Molinaro could have performed the same services himself. It is also clear that Mr. Petrakis' services in preparing the witnesses were in effect performed as a benefit to, or as a substitute for Mr. Molinaro. Accordingly his services will be compensated at Mr. Molinaro's hourly rate of $130 instead of his typical rate of $150 per hour.

On the other hand, this does not mean that the involvement of more than one attorney in a given matter or hearing is always prohibited. At the more difficult stages of the case, where particularly difficult issues of bankruptcy law are involved, it is clear that Mr. Molinaro, who is after all, still somewhat green in terms of experience, may require the experience and assistance of his senior partner, Mr. Pellic-

**26.** Obviously Mr. Molinaro couldn't interrogate himself at the fee hearing. However he could, and did, conduct the rest of that hearing.

cioni. The Court has little difficulty in concluding that, other than noted hereinafter in connection with the preparation and prosecution of the fee application, the full amount sought by Mr. Molinaro will be allowed, as he has presented well-documented comprehensible time records. However, only a portion of the fees charged by Mr. Pelliccioni will be awarded, as many of his billing descriptions are not sufficiently detailed as required by this Court.

Due to Mr. Pelliccioni's expertise in bankruptcy law, many of his services are deemed adequate due to the particular category in which they appear. This Court believes that Mr. Pelliccioni's services regarding cash collateral, sale of property, and closure issues were necessary to Katten's representation of the debtor. However, nearly half of Mr. Pelliccioni's requested fees are denied due to inadequate entries which make it impossible for the Court to determine the nature of the services provided, or whether his services duplicated those of another Katten attorney.[27] As with Mr. Petrakis, Mr. Pelliccioni's duplication of the work of or attendance at meetings with other Katten attorneys cannot be compensated where there is no indication of what he contributed to the meeting or why his presence there was necessary. Failing such explanation, his services are deemed duplicative except in specific areas previously noted and will not be compensated where his descriptions are inadequate.

■■■ There is the additional question of Mr. O'Brien's services, Mr. O'Brien is a health law partner at Katten. Much of his time was spent on a "stand-by" basis, i.e. attending hearings to be there in case an issue of health law arose. In fact, the health law issues in the case were few and far between. Mr. O'Brien could have stood by just as easily back at the Katten office and worked on other matters. There is a telephone outside the courtroom. Mr. O'Brien could have been summoned when needed. The court would have been willing to wait. At the most, 25% of Mr. O'Brien's court time was productive. Accordingly, 75% of Mr. O'Brien's court time is disallowed.

■■■ The point of all of this is simple enough. The circumstances where a debtor in a Chapter 11 case would require representation by three or four lawyers in actual attendance at a court hearing are extremely rare. Those circumstances were not present in this case. Despite the protestations of debtor's counsel, this was not a particularity unique or difficult Chapter 11 case. Bankruptcy cases involving health care facility cases involving hospitals or nursing homes are, unfortunately, all too common.[28] For most court appearances, one lawyer would have been enough, complicated crucial proceedings would usually justify two. Nothing in this case required three or more.

As with Mr. Petrakis, the billing descriptions of many of the Katten attorneys were either insufficient or duplicative or unnecessary, and those fees will be denied accordingly. However, some fees will be awarded for the research and drafting services provided by Ms. Jansen, and Messers. Olson, Ross and Sherman.

The attorneys' fees to be awarded from Katten's retainer were determined as follows:

1. *Michael Molinaro.* The fee applications request $38,077.00 (292.9 hours x $130/hour) for Mr. Molinaro's services,

---

**27.** Examples of inadequate entries by Mr. Pelliccioni include:

| | | |
|---|---|---|
| 1/22/87 | Prepare for press conference | 1.30 |
| | Attend press conference | 1.70 |
| 1/23/87 | Calls to and from newspapers | .20 |
| | Conference with Molinaro and review documents | 1.80 |
| 2/02/87 | Review pleadings | .80 |
| 2/04/87 | Calls to and from Ray Soto, Calls with Mike Molinaro, review pleadings | 1.60 |
| 3/19/87 | Calls to and from creditors | 1.00 |

**28.** By way of example, this Court currently has three such cases pending on its docket. *See In re Christ the King Nursing Care Center, Inc.,* Case No. 85 B 12465; *In re Chicago Lutheran Hospital Association d/b/a Walther Memorial Hospital,* Case No. 87 B 970; *In re Provident Hospital Training Assoc.,* Case No. 87 B 11069.

but this amount has been reduced by 59.3 hours, or $7,709.00 which were billed to preparation of fee applications.[29] His services were reasonable and necessary to the representation of the debtor, and his billing descriptions were sufficiently detailed to support compensation of $30,368.00 (233.6 hours x $130/hour).

2. *Daniel Pelliccioni.* The fee applications request $24,907.50 (110.7 hours x $225/hour) for Mr. Pelliccioni's services, however, many of his billing descriptions are lumped and/or are not sufficiently detailed to support all of the charges. As supervisor to this case, he will be compensated for the hearings he attended and for those services which are adequately detailed, for a total award of $13,500.00 (60.0 hours x $225/hour).

3. *Peter Petrakis.* The fee applications request $15,060.00 (110.4 hours x $150/hour) for Mr. Petrakis' services, but most of his fees are denied as his billing descriptions were generally inadequate and the majority of his services were either duplicative or unnecessary, with the exception of the preparation of certain witnesses for hearings. Since those services were provided to assist Mr. Molinaro and relieve him of those particular duties, Mr. Petrakis services shall be compensated at Mr. Molinaro's hourly rate of $130, for a total award of $1560 (12.0 hours x $130/hour).

4. *Mark Sherman.* Junior associate; researched various issues and worked closely with Mr. Molinaro. Fee applications request $5,917.50 (78.9 hours x $75/hour) for his services. His services will be awarded at $5,250.00 (70.0 x $75/hour), as his billings are generally sufficiently detailed, excluding those hours billed to preparation of fee application, and those duplicated by Messers. Molinaro and Pelliccioni.

5. *Brenda Jansen.* Junior associate; drafted motions, memos and orders. Fee applications request $8,062.50 (107.5 hours x $75/hour) for her services. Fees awarded equal $5,917.50 (78.9 hours x $75/hour), excluding many cash collateral hours which are lumped, or insufficiently detailed.

6. *Phillip O'Brien.* Fee applications request $2,820.00 (18.8 hours x $150/hour) for Mr. O'Brien's services as a health care specialist. As discussed above, his appearance at hearings were duplicative and unnecessary, and only 25% of his fees will be awarded, at $705.00 (4.7 hours x $150/hour).

7. *David Ross.* Junior associate; researched closure issues. Total fees of $495.00 (6.6 hours x $75/hour) to be awarded as necessary and reasonable.

8. *Steven Olson.* Associate; researched closure and procedures plan. Total fees of $1,512.00 requested (12.6 hours x $120/hour). Fees of $900.00 (7.5 hours x $120/hour) to be awarded, due to some insufficient detail in billing.

All other requests for attorney's fees are denied as duplicative and/or insufficient in explanation. Paralegal services are clearly documented, appear reasonable, and will be allowed in full.[30]

▪ Finally, the question remains how much Katten is to be allowed for its services in connection with its own fee application. Katten seeks more than $13,000.00 for its time in the preparation and prosecution of its fee application. While the Court has previously ruled herein that this time

---

29. Katten's reimbursement for hours spent preparing its own fee petition is discussed *infra.*

30. As to reimbursement of costs, obviously some of Katten's costs should be disallowed. For example, if a lawyer's attendance at a court hearing was unnecessary, the cab fare to get that lawyer to that hearing would not be reimbursable. The Court has not sorted out the reimbursable costs from those which are not reimbursable. All of the costs sought by Katten appear to be otherwise reimbursable if rendered in connection with compensable services. The Court suspects that the amount of costs which are nonreimbursable is de minimis. Therefore, the Court will allow Katten the full amount sought for expenses. If the trustee or the United States wants a further hearing on the costs questions, either may file an appropriate motion.

spent preparing and prosecuting a fee application is compensable, the Court has also held that such time must be reasonable. Here, Katten's bill for the preparation and prosecution of its fee application amounts to some 13% of the total compensation it seeks. Obviously, such a large percentage of the total time spent on pursuing fees is unreasonable. *Pettibone*, 74 B.R. at 304.

█ Much of Katten's fee time was spent on pursuit of its 11 U.S.C. § 506(c) claim. Since the Court has ruled that claim is essentially without merit, time spent by Katten in pursuing that claim must be disallowed as well. In addition, this Court has identified deficiencies in the fee application in terms of adequacy of time entries by certain attorneys. However, the Court must also recognize that Katten's lawyers, including Mr. Petrakis, were required to spend additional time preparing for and conducting a contested fee hearing in order to obtain the amounts actually awarded. Accordingly, in the unique facts and circumstances of this case, the Court will allow Katten an additional fees of 7.5% of the amount previously awarded, or $4502.81, for its time and additional fee in pursuing its fee application. Seven and one-half percent should not be regarded as a rule of thumb for any future case.[31]

The total award of $74,449.55 is, therefore, determined as follows:

| ATTORNEY | HOURS | RATE | VALUE |
|---|---|---|---|
| Daniel M. Pelliccioni | 60.0 | $225.00 | $13,500.00 |
| Philip J. O'Brien | 4.7 | 150.00 | 705.00 |
| Michael L. Molinaro | 233.6 | 130.00 | 30,368.00 |
| Peter Petrakis | 12.0 | 130.00 | 1,560.00 |
| Steven R. Olson | 7.5 | 120.00 | 900.00 |
| Brenda Jansen | 78.9 | 75.00 | 5,917.50 |
| David Ross | 6.6 | 75.00 | 495.00 |
| Marc D. Sherman | 70.0 | 75.00 | 5.250.00 |
| | | | |
| Subtotal | | | $58,695.50 |
| Paralegal (excluding services for preparation of fee application) | | | $ 1,342.00 |
| Subtotal | | | $60,037.50 |

**31.** This amount includes time for Mr. Petrakis' participation at the fee hearing.

**32.** As Judge Schmetterer put it in *Pettibone,*
[G]iven the heavy flow of work through the bankruptcy courts and the many hundreds of fee petitions passed on by each bankruptcy judge each year (certainly over a thousand in both Chapter 7 and Chapter 11 cases), counsel

| | |
|---|---|
| 7.5 percent preparation of fee application | $ 4,502.81 |
| TOTAL FEES FOR SERVICES | $64,540.31 |
| Expenses | $ 9,909.24 |
| TOTAL AWARD | $74,449.55 |

█ After the initial order in this matter was vacated, Katten asked the Court to amend the compensation to Mr. Petrakis and Mr. Pellicioni by reading their time entries "in conjunction with the entire" Katten application, or in the alternative, to grant Katten leave to supplement its fee application with more detailed time entries.

This Court has already spent innumerable hours reviewing time entries of each Katten attorney in conjunction with the entire fee application in order to determine the reasonableness and necessity of each entry to the representation of the debtor. Upon further examination of the fee application the Court has agreed that Mr. Petrakis is entitled to compensation for his preparation of certain witnesses. However, the Court sees no basis for additional compensation to other Katten attorneys based on ex post facto and post hearing reconstruction of time records after the applicants have been advised of the Court's views. This Court does not have the time to conduct an advisory fee hearing in order to tell experienced bankruptcy lawyers what is required in a fee application.[32] The caselaw in this district has long described what is required. This opinion should not come as a surprise to Katten or its lawyers. This Court has neither the time nor the inclination to reconstruct the application by making surmises about what individual entries might mean based on other entries by other attorneys. Accordingly, Katten's motion for leave to supplement its fee application is denied.

IT IS HEREBY ORDERED that the law firm of Katten, Muchin & Zavis be awarded the sum of $74,449.55 from its retainer for its representation of the debtor in this mat-

must be held to the ordinary standards for reconsideration. Otherwise, many fee applications would take a second bite at the apple after the fees they seek are reduced. There is no reason why this Court should be subject to the burden of double fee hearings....
*Pettibone* at 300.

ter. It is further ordered that the balance of the retainer be returned to the estate.

IT IS FURTHER ORDERED that the compensation requested by the law firm of Lord, Bissel & Brook as attorneys for the Unsecured Creditors' Committee is denied.

IT IS FURTHER ORDERED that the United States does not have a lien on the proceeds of the medical malpractice fund that could be traced to Katten's retainer.

IT IS FURTHER ORDERED that Katten's motion for leave to supplement its fee application is denied.